FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CARLOS ALBERTO BRINGAS-RODRIGUEZ, AKA Patricio Iron-Rodriguez, *Petitioner*, <br><br> v. <br><br> JEFFERSON B. SESSIONS III[*], Attorney General, *Respondent*. | No. 13-72682 <br><br> Agency No. A200-821-303 <br><br><br> OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc September 7, 2016
San Francisco, California

Filed March 8, 2017

Before: Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain, Barry G. Silverman, Kim McLane Wardlaw,
William A. Fletcher, Richard R. Clifton, Carlos T. Bea,
Milan D. Smith, Jr., Morgan B. Christen, John B. Owens
and Michelle T. Friedland, Circuit Judges.

---

[*] Jefferson B. Sessions III is substituted for his predecessor as
Attorney General of the United States, pursuant to Federal Rule of
Appellate Procedure 43(c).

Opinion by Judge Wardlaw;
Concurrence by Judge Clifton;
Dissent by Judge Bea

## SUMMARY[**]

### Immigration

The en banc court granted a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and protection under the Convention Against Torture to a citizen of Mexico who asserted that Mexican officials were unable or unwilling to protect him from harm by private individuals due to his sexual orientation.

The en banc court held that the evidence Bringas-Rodriguez adduced before the agency—credible written and oral testimony that reporting his abuse would have been futile and potentially dangerous, that other young gay men had reported their abuse to the Mexican police to no avail, and country reports and news articles documenting official and private persecution of individuals on account of their sexual orientation—satisfied longstanding evidentiary standards for establishing past persecution and compelled the conclusion that Bringas-Rodriguez suffered past persecution that the Mexican government was unable or unwilling to control.

The court overruled *Castro-Martinez v. Holder*, 674 F.3d 1073 (9th Cir. 2011), and other circuit precedent, to the extent

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

they introduced the construct that the failure to report private persecution to government authorities creates a "gap" in the evidence or imposed a heightened evidentiary requirement to establish governmental inability or unwillingness to protect.

The en banc court held that Bringas-Rodriguez was entitled to a presumption of future persecution and remanded for the Board to consider whether the presumption was rebutted, and to consider Bringas-Rodriguez's claims for withholding of removal and CAT protection, taking into account new evidence of Bringas-Rodriguez's HIV diagnosis.

Concurring in the judgment, Judge Clifton agreed that the petition should be granted and remanded for further proceedings, but would not dictate to the Board that Bringas-Rodriguez established past persecution.

Dissenting, Judge Bea, joined by Judge O'Scannlain, wrote that the majority failed to properly apply the substantial evidence standard and would hold that the evidence does not compel the conclusion that the Mexican government is unwilling or unable to protect homosexuals from persecution.

**COUNSEL**

Erwin Chemerinsky (argued), Kathryn M. Davis, and Munmeeth Soni, Pro Bono Counsel, University of California, Irvine School of Law, Appellate Litigation Clinic, Irvine, California; Andrea Ringer and Marco Pulido Marquez, Certified Law Students, University of California, Irvine School of Law, Appellate Litigation Clinic, Irvine, California; Mary-Christine Sungaila, Pro Bono Attorney, Snell & Wilmer LLP and Haynes and Boone LLP, Costa Mesa, California, for Petitioner.

John W. Blakely (argued), Assistant Director, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Donald E. Keener, Deputy Director, Stuart F. Delery, Assistant Attorney General, Civil Division, Kohsei Ugumori and Jesi J. Carlson, Senior Litigation Counsel, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Respondent.

Peter E. Perkowski, Perkowski Legal, PC, Los Angeles, California, for Amici Curiae The Public Law Center, Lambda Legal Defense and Education Fund, the National Immigrant Justice Center, the Center for HIV Law and Policy; HIV Law Project; Immigration Equality; Disability Rights Legal Center; the Asian & Pacific Islander Wellness Center, National Center for Lesbian Rights, LGBT Center OC, Transgender Law Center, Florence Immigrant & Refugee Rights Project, and Centro Legal De La Raza.

Charanya Krishnaswami, Cortelyou C. Kenney (Volunteer), and Lisa Jaskol, Public Counsel, Los Angeles, California, for Amici Curiae Kids In Need of Defense, Tahirih Justice Center, and Women's Refugee Commission.

Laurie Webb Daniel, Charles L. Coleman III, Kyong M. Kim, and Garrett S. Garfield, Pro Bono Counsel, Holland & Knight LLP, San Francisco, California; Eunice Lee, Karen Musalo, and Blaine Bookey, Counsel, Center for Gender & Refugee Studies, San Francisco, California; for Amicus Curiae of Center for Gender & Refugee Studies.

Alice Farmer, United Nations High Commissioner for Refugees, Washington, D.C.; Ana C. Reyes, Counsel of Record, Williams & Connolly LLP, Washington, D.C.; for Amicus Curiae United Nations High Commissioner for Refugees.

**OPINION**

WARDLAW, Circuit Judge:

Carlos Alberto Bringas-Rodriguez (Bringas), a gay man who is a native and citizen of Mexico, petitions for review of the Board of Immigration Appeals' (BIA) denial of his applications for asylum, withholding of removal, and Convention Against Torture (CAT) protection. Bringas was physically and sexually abused as a child on account of his sexual orientation, and he submitted evidence that Mexico was unable or unwilling to control his persecutors. Both the Immigration Judge (IJ) and the BIA found Bringas's testimony credible, and both acknowledged that sexual orientation and identity can establish membership in a "particular social group." Nevertheless, both the IJ and the BIA denied Bringas relief, in part based on a conclusion that his evidence was insufficient to demonstrate that the Mexican government was unable or unwilling to control the private individuals who attacked him. In so doing, both the IJ and the BIA failed to address Bringas's plausible, unrefuted testimony that Mexican police laughed at his gay friends who attempted to report rape and other abuse.

A divided panel of our court agreed, relying primarily on our decision in *Castro-Martinez v. Holder*, 674 F.3d 1073 (9th Cir. 2011), which interpreted the "unable or unwilling to control" standard as requiring proof that the police are unable or unwilling to control the sexual abuse of children generally. *Bringas-Rodriguez v. Lynch*, 805 F.3d 1171, 1178–79 (9th Cir. 2015) (now withdrawn). The panel majority adopted the IJ's conclusion that it was unlikely that the Mexican government would take no action to control the "abuse of children." *Id.* at 1181–82. We granted rehearing en banc and

now hold that the evidence Bringas adduced before the agency—credible written and oral testimony that reporting was futile and potentially dangerous, that other young gay men had reported their abuse to the Mexican police to no avail, and country reports and news articles documenting official and private persecution of individuals on account of their sexual orientation—satisfies our longstanding evidentiary standards for establishing past persecution and compels the conclusion that Bringas suffered past persecution that the Mexican government was unable or unwilling to control.[1]  We overrule *Castro-Martinez* to the extent it might suggest otherwise and remand this petition to the BIA for further proceedings.

## I.

Born in Tres Valles, Veracruz, Mexico, Bringas was horrifically abused by his father, an uncle, cousins, and a neighbor, all of whom perceived him to be gay or to exhibit effeminate characteristics.  His uncle first raped him when he was four years old, and in addition to his uncle, three of his cousins and a male neighbor physically and sexually abused him on a regular basis while he lived in Mexico.  Bringas's father also beat him as a child, telling him, "Act like a boy. You are not a woman."  When he was eight, Bringas's uncle told him that the abuse was because he was gay.  His uncle, cousins, and neighbor never called him by his name, referring

---

[1] Contrary to the dissent's suggestion, Bringas submitted substantial corroborating evidence after the IJ recommended he do so.  That evidence included a 2010 U.S. Department of State Country Report for Mexico, several newspaper articles, and a psychological evaluation describing Bringas's past history of abuse.

to him only as "fag, fucking faggot, queer," and they "laughed about it."

Bringas lived with his mother in the United States for a brief period when he was twelve years old. He returned to Mexico, however, because he missed his grandmother, who had raised him since he was nine. The abuse intensified upon his return. Again he was repeatedly raped by his uncle, cousins, and neighbor.

On one occasion, when Bringas refused to comply with his neighbor's demand for oral copulation, the neighbor beat and raped him, leaving Bringas with black eyes and bruises. Bringas's abusers also threatened to hurt his grandmother, with whom he was close, if he ever reported what was happening. Fearing that they would follow through on their threats, Bringas did not tell his mother, teachers, or anyone else about the sexual abuse.

Bringas fled Mexico in 2004 at age fourteen to get away from his abusers. He entered the United States without inspection at El Paso, Texas, and lived with his mother in Kansas for three years. He then moved out of his mother's home, living elsewhere in Kansas and in Colorado. He worked several different jobs, including positions at a supermarket, a pizzeria, and a chocolate shop. In August 2010, Bringas pleaded guilty to attempted contributing to the delinquency of a minor in Colorado; he had been at home drinking with some friends when another friend brought over a minor who became drunk. Bringas spent ninety days in jail, during which time he attempted suicide and was hospitalized, which precipitated his finally telling a doctor and then his mother about his childhood abuse. The Department of

Homeland Security (DHS) issued a Notice to Appear in August 2010.

In 2011, at age twenty, Bringas applied for asylum, withholding of removal, and CAT protection. He had previously been unaware "that the [U.S.] government could protect [him]," and only found out when he "spoke with an ICE officer in Colorado in September 2010." In his application, Bringas described the sexual abuse he endured in Mexico and explained that he feared persecution if he returned because he was gay and that the Mexican police would not protect him. Bringas also credibly testified about his gay friends' experiences with police in Veracruz. Those friends went to the police to report that they had been raped, but the officers ignored their reports and "laugh[ed] on [sic] their faces." Additionally, he submitted 2009 and 2010 U.S. Department of State Country Reports for Mexico and several newspaper articles that documented violence against, including murders of, gays and lesbians. The reports showed that the violence rose even as—and perhaps because— Mexican laws were becoming increasingly tolerant of gay rights.[2]

---

[2] The United Nations High Commissioner for Refugees (UNHCR) has issued guidelines for refugee claims based on sexual orientation, which explain that legal improvements and widespread persecution are not mutually exclusive. UNHCR, *Guidelines on International Protection No. 9: Claims to Refugee Status Based on Sexual Orientation and/or Gender Identity Within the Context of Article 1A(2) of the 1951 Convention and/or Its 1967 Protocol Relating to the Status of Refugees*, ¶ 37, U.N. Doc. HCR/GIP/12/09 (Oct. 23, 2012), *available at* http://www.unhcr.org/509136ca9.pdf.

The BIA, reviewing the IJ's denial of Bringas's claims for relief, rejected his claims on the merits.[3] The BIA recognized "the serious abuse that [Bringas] endured as a child." It found, however, that, as in *Castro-Martinez*, Bringas did not demonstrate that the "abuse was inflicted by government actors or that the government was unwilling or unable to control his abusers." Concluding that Bringas thus failed to establish past persecution, the BIA denied Bringas the concomitant presumption of future persecution. It then rejected Bringas's argument that he had a well-founded fear of future persecution because he had failed to show a pattern or practice of persecution of gay men in Mexico, distinguishing *Bromfield v. Mukasey*, 543 F.3d 1071 (9th Cir. 2008), because "the record . . . d[id] not demonstrate widespread brutality against homosexuals or that there [was] any criminalization of homosexual conduct in Mexico." The BIA also concluded that Bringas had failed to show that the Mexican government had been unable or unwilling to control private individuals who perpetuated violence against homosexuals, finding that Mexico "has taken numerous positive steps to address the rights of homosexuals." Finally, the BIA rejected Bringas's withholding of removal and CAT claims and denied a remand to consider his HIV-positive diagnosis.

The majority of a divided three-judge panel of our court agreed that Bringas had failed to meet the heightened

---

[3] The IJ denied Bringas's asylum claim as untimely under the one-year filing rule after some scuffling about whether Bringas had entered the United States as an unaccompanied minor. The BIA, however, assumed that the asylum application was timely, electing to determine Bringas's asylum claim on its merits. We must do the same. *See Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc).

evidentiary burden for past persecution that it and the BIA determined applicable to Bringas's claim based on their reading of *Castro-Martinez*. Acknowledging that nothing requires an abuse victim, "let alone a child," to report persecution to the police, the panel majority reasoned that where a victim fails to report abuse, even as a child, "there is a 'gap in proof about how the government would have responded,' and the petitioner bears the burden to 'fill in the gaps' by showing how the government would have responded had he reported the abuse." *Bringas-Rodriguez*, 805 F.3d at 1178 (quoting *Castro-Martinez*, 674 F.3d at 1081). The panel majority found the 2009 and 2010 country reports inadequate to establish widespread, uncontrolled persecution of gay men in either Bringas's home state or town. *Id.* at 1178–80. Rather, the panel majority found that the country reports demonstrated that Mexico permitted gay pride marches and had expanded marriage equality. *Id.* at 1179. The panel majority also cited a United Nations report stating that Mexico had established a "'specialized hate crime prosecution unit[],' developed a 'new judicial protocol to guide adjudication of cases involving human rights violations on grounds of sexual orientation,' implemented specialized training for police officers, and officially designated May 17 as 'National Day Against Homophobia.'" *Id.* at 1179 n.5 (alteration in original) (quoting U.N. High Comm'r for Human Rights, *Discrimination & Violence Against Individuals Based on Their Sexual Orientation & Gender Identity*, ¶¶ 40, 74, 75 U.N. Doc. A/HRC/29/23 (May 4, 2015)[4]). Furthermore, the panel majority found insufficient

---

[4] *Available at* http://www.un.org/en/ga/search/view_doc.asp?symbol=A/HRC/29/23. One of the eighteen amici that submitted briefs supporting Bringas is the UNHCR. The UNHCR did so to "correct[] any misunderstanding or lack of clarity" in its assessment of

Bringas's testimony that his gay male friends had suffered persecution and reported it to the police in Veracruz, only to have the officers laugh at them. *Id.* at 1180–81. Even if the friends' reports were credited, the panel majority explained, those reports failed to establish that police practices in the city or state of Veracruz could be linked to police practices in Tres Valles, Bringas's hometown. *Id.*

Further in support of its conclusion, the panel majority noted the absence of evidence in the record suggesting that Mexican police refuse to protect sexually abused children. Stating that "Bringas's allegations are not just about discrimination against gay and lesbian Mexicans—they are about child molestation," the panel majority found Bringas's evidence lacking because he "ha[d] put forward no evidence that Mexico tolerates the sexual abuse of children, or that Mexican officials would refuse to protect an abused child based on the gender of his or her abusers." *Id.* at 1182. Because Bringas had not described "how old his 'friends' were who reported abuse to the police," Bringas's testimony about those reports was insufficient. *Id.* at 1181.

Finally, the panel majority interpreted *Castro-Martinez* to foreclose it from finding that Bringas's subjective fear of future persecution was objectively reasonable, again citing the "improving" situation for gay men in Mexico. *Id.* at 1182–83.

---

the experiences of lesbian, gay, bisexual, transgender and intersex (LGBTI) individuals in Mexico. Brief for UNHCR as Amicus Curiae at 3. In particular, the UNHCR states that it "has not taken the position that LGBTI individuals fleeing Mexico cannot have a well-founded fear of persecution," *id.* at 5, contradicting the panel majority's conclusion to the contrary, *see Bringas-Rodriguez*, 805 F.3d at 1179 n.5.

Judge W. Fletcher dissented, writing that he had developed misgivings about *Castro-Martinez*—an opinion in which he had joined—but also explaining that even if *Castro-Martinez* controlled, he "part[ed] ways with the majority" on its reading of the decision to reject Bringas's asylum claim. *Id.* at 1186–87 (Fletcher, J., dissenting). Judge W. Fletcher pointed to our ample precedent that does not require victims of private persecution, especially child victims, to contemporaneously report their abuse to government authorities in order to become eligible for asylum in the United States. *Id.* at 1192. "Yet," he wrote, "*Castro-Martinez* and today's decision effectively require just that." *Id.*

## II.

We have jurisdiction under 8 U.S.C. § 1252(a). Because the BIA conducted its own review and did not adopt the IJ's decision, our review "is limited to the BIA's decision." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation mark omitted) (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 990 (9th Cir. 2000)). We review the Board's legal conclusions de novo, *Romero-Mendoza v. Holder*, 665 F.3d 1105, 1107 (9th Cir. 2011), and its factual findings for substantial evidence, *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014). A finding by the IJ is not supported by substantial evidence when "'any reasonable adjudicator would be compelled to conclude to the contrary' based on the evidence in the record." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

**III.**

*A.  Evolution of U.S. Refugee Law*

Because this case ultimately turns on whether Bringas has adduced compelling evidence that he is a refugee who is presumptively eligible for asylum based on past persecution by nongovernmental actors, it is helpful to our analysis to review the development of our refugee laws generally.

Beginning with the persons displaced by World War II, the United States has struggled to define its approach to refugees. *See* Stephen H. Legomsky & Cristina M. Rodríguez, *Immigration and Refugee Law and Policy* 874–76, 878 (5th ed. 2009).  The Immigration and Nationality Act (INA) of 1952, Pub. L. No. 82-414, 66 Stat. 163, and its predecessor, the Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153, "contained no special provision exempting [refugees] from the restrictions generally applicable to immigrants." *Id.* at 876, 881; *see also* Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9, 14 (1981).  As a result, until Congress passed comprehensive legislation concerning refugees in 1980, the United States largely responded to refugee crises on an ad hoc basis and with temporary measures. Legomsky & Rodríguez, *supra*, at 881.  The Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009, was the first such measure, and provided sanctuary for certain refugees fleeing Nazi, Soviet, or fascist persecution, as well as "displaced[] forced laborers from states conquered by Germany."  Anker & Posner, *supra*, at 13.  Later legislative efforts included the Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400, and its extension in 1957, which assisted "victims of natural calamities" and

refugees from "communist-dominated parts of Europe and the Middle East." Anker & Posner, *supra*, at 14.

Finding these narrow policies inadequate, President Eisenhower decided after the Soviets invaded Hungary in 1956—causing some 200,000 Hungarians to flee—to request that the Attorney General temporarily parole 15,000 Hungarian refugees into the United States. *Id.* at 14–15. At that time, under the INA, the Attorney General had the discretion to parole, but not to formally admit, persons into the country "for emergent reasons or for reasons deemed strictly in the public interest." *Id.* at 15 (quoting 8 U.S.C. § 1182(d)(5) (1952)). Parole was originally intended to benefit individual noncitizens in emergency situations; the Hungarian crisis represented the first time it was used to admit refugees en masse. *Id.*

In light of the president's expanded use of parole, Congress decided to reassert itself into refugee policy and create a more structured regime. Legomsky & Rodríguez*, supra*, at 881–82. The first permanent statutory basis for admitting refugees was enacted in 1965 as part of a group of amendments to the INA. *Id.* at 881. Under the 1965 amendments, a new admissions category was created for "those who feared persecution and were fleeing either a 'Communist-dominated' country or a country 'within the general area of the Middle East.'" *Id.* at 881 (quoting Pub. L. No. 89-236 § 3, 79 Stat. 911, 913 (1965)). However, the geographic and ideological restrictions of the category, as well as the "painfully inadequate" ceiling of 17,400 entries per year, limited the category's reach. *Id.* at 881–82. Presidents therefore continued to rely on parole when refugee crises arose, granting entry to hundreds of thousands of refugees from Cuba, Indochina, and Soviet and Eastern

European countries. *Id.* at 882. In other words, refugee admissions remained ad hoc, spurring policy proposals for overhauling the system that were debated throughout the 1970s. Anker & Posner, *supra*, at 20–42.

In 1980, to limit the parole power, create a predictable and permanent admissions system, and fulfill international obligations, Congress passed the Refugee Act of 1980 (the "Act"), Pub. L. No. 96-212, 94 Stat. 102. Legomsky & Rodríguez, *supra*, at 882–83. The final version of the bill set quotas for refugee admissions and limited the executive branch's parole authority. Anker & Posner, *supra*, at 60–62. It adopted the nondiscriminatory definition of refugee included in the 1951 United Nations Convention Relating to the Status of Refugees, but amended it by including not only persons who feared future persecution but also those who were victims of past persecution.[5] Deborah Anker, *Law of Asylum in the United States* § 1:2 (2016). Furthermore, the Act provided a statutory basis for asylum, the granting of status to refugees who arrive or have been physically present in the United States. *Id.*; *see also* Legomsky & Rodríguez, *supra*, at 893. The Act also brought the United States into conformity with the 1951 Convention with respect to withholding of removal, the remedy by which an applicant can prevent forcible return to a country where he fears persecution. Legomsky & Rodríguez, *supra*, at 893. To this day, the Act is the principal statute governing the admission of refugees, grants of asylum, and withholding of removal. Legomsky & Rodríguez, *supra*, at 883.

---

[5] In 1968, the United States ratified the United Nations Protocol Relating to the Status of Refugees, which incorporated the 1951 Convention.

The concept of persecution by non-state actors is "inherent" in the definitions of persecution in the 1951 Convention and the Refugee Act of 1980.  Anker, *supra*, at § 4:8.  Indeed, the 1979 UNHCR Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees stated that persecution included "serious discriminatory or other offensive acts . . . committed by the local populace . . . if they are knowingly tolerated by the authorities, or if the authorities refuse, or prove unable, to offer effective protection."  Anker & Posner, *supra*, at 67 (quoting UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (1979)). Even under U.S. statutory definitions of persecution pre-dating the Refugee Act of 1980, a First Circuit opinion and a published, precedential BIA opinion suggested that persecution by non-state actors was cognizable as a predicate for relief.  *See Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971); *Matter of Eusaph*, 10 I. & N. Dec. 453, 454 (BIA 1964).

Our circuit first determined that the appropriate standard of review for BIA decisions under the Refugee Act of 1980 is the now familiar "substantial evidence" test in *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir. 1981).  *See Sagermark v. INS*, 767 F.2d 645, 649 (9th Cir. 1985).  *McMullen* also provided our first occasion to address "[p]ersecution by . . . a group which the government is unable to control" under the Act.  *McMullen*, 658 F.2d at 1315.

McMullen, a Catholic of Irish descent, had joined the British Army and been deployed to Northern Ireland in 1969 as part of British peacekeeping efforts.  *Id.* at 1314.  As the British soldiers became more violently anti-Catholic,

torturing prisoners and plotting to use armed force against nonviolent civilian demonstrators, McMullen deserted them to join the Provisional Irish Republican Army (PIRA), a nongovernmental group that purported to protect Catholics from the British army, but which eventually became, in McMullen's view, extremist and terroristic. *Id.* He quit the PIRA, but was jailed by the Republic of Ireland police for his earlier activities as part of the PIRA. *Id.* When he was released, the PIRA pressured him to participate in a plan to kidnap an American, but McMullen refused. *Id.*

Upon learning that the PIRA intended to murder him for that refusal, McMullen fled to the United States, cooperated with U.S. authorities, and sought withholding of removal.[6] *Id.* at 1313–14. The BIA reversed the IJ's determination that "McMullen was not deportable because 'the Government of the Republic of Ireland is unable to control the activities of the PIRA and that if [McMullen] were to be returned to that country he would suffer persecution within the meaning of the (United Nations) Convention, Protocol, and section

---

[6] *McMullen* concerned an application for withholding of removal, not asylum, but the analysis of "persecution" is the same for both. To obtain withholding of removal, the Refugee Act of 1980 requires that an applicant show that his "life or freedom would be threatened" if returned to his home country. *See* 8 U.S.C. § 1231(b)(3). Though semantically different from the required showing of "persecution" to prove that one is a refugee eligible for asylum, a threat to life or freedom has been equated with persecution by the BIA and courts, including the Supreme Court. *See INS v. Stevic*, 467 U.S. 407, 429–30 (1984). Indeed, the current regulations governing withholding of removal use the terms interchangeably, 8 C.F.R. § 1208.16, as did we in *McMullen*. Furthermore, although the specific statutory provision at issue in *McMullen*, 8 U.S.C. § 1253(h), was the predecessor to the current withholding of removal statute, 8 U.S.C. § 1231(b)(3), the relevant statutory language is identical.

243(h) (of 8 U.S.C. § 1253(h)).'" *Id.* at 1315. Before our court, the government "concede[d] that persecution within the meaning of [section] 243(h) includes persecution by non-governmental groups such as the PIRA, where it is shown that the government of the proposed country of deportation is unwilling or unable to control that group." *Id.* at 1315 n.2.

## B.  Refugee Law Today

The Attorney General may, in his discretion, grant asylum to applicants in the United States who meet the definition of "refugee" under 8 U.S.C. § 1101(a)(42)(A).  8 U.S.C. § 1158(b)(1).  An applicant qualifies as a refugee if he "is unable or unwilling to return to his home country because of a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Navas v. INS*, 217 F.3d 646, 654 (9th Cir. 2000).  An applicant may establish a "well-founded fear of future persecution" in two ways: by proving past persecution, or by demonstrating that he has a "subjectively genuine and objectively reasonable" fear of future persecution. *Id.* at 654–56, 656 n.11.

Because Bringas applied for asylum after the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, he must show that his sexual orientation was "one central reason" for his persecution.  8 U.S.C. § 1158(b)(1)(B)(I). However, his "persecution may be caused by more than one central reason, and [he] need not prove which reason was dominant." *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009).  If Bringas is able to show that he was subjected to past persecution, he is entitled to a rebuttable presumption of a well-founded fear of future persecution. *Tawadrus v.*

*Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004); *see also* 8 C.F.R. § 1208.13(b)(1).

## C.  The *"Unable or Unwilling" Standard*

"An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010).

### 1.  Early decisions discussing the "unable or unwilling" standard in the context of private persecution

For several years following passage of the Refugee Act of 1980, decisions considering whether a government was unable or unwilling to control private persecution almost exclusively involved a fear of future persecution by organized groups, such as anti-government guerillas. *See., e.g.*, *Arteaga v. INS*, 836 F.2d 1227, 1231 (9th Cir. 1988) (remanding for the BIA to consider whether the petitioner established a well-founded fear of persecution by guerillas that the El Salvadoran government could not control), *abrogated on other grounds by INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (holding that the petitioner had been persecuted by a terrorist group that the government of India could not control).  In such decisions, either it was undisputed that the government was unable or unwilling to control the powerful organizations at issue, or the inability to control was proved through documentary evidence, such as country conditions

reports. *See, e.g.*, *Gomez-Saballos v. INS*, 79 F.3d 912, 916–17 (9th Cir. 1996) (concluding that "documentary evidence about general conditions in Nicaragua" was enough to show that the government was "unable to control" former National Guard members); *Arteaga*, 836 F.2d at 1231 (analyzing eligibility for asylum under the assumption that guerillas were not controlled by the government).

Later petitions for review, however, involved claims for relief based on past persecution by unorganized groups and individuals. *See, e.g.*, *Singh v. INS*, 94 F.3d 1353, 1357–60 (9th Cir. 1996) (stating that the petitioner's assailants "need not [have] file[d] articles of incorporation before they can be capable of persecution"). In such instances, where the petitioner was required to show that previous attacks were committed in the shadow of an acquiescent government, we looked to evidence of how the police responded to the petitioner's requests for protection. In *Singh*, for example, the petitioner—an ethnic Indian citizen of Fiji—received death threats from ethnic Fijians and was assaulted at work. *Id.* at 1357–58. He and his family were also attacked twice at their home. *Id.* We looked to record evidence showing that "the government ha[d] encouraged and condoned the discrimination, harassment, and violence by ethnic Fijians against Indo-Fijians." *Id.* at 1360. But we also highlighted that "Singh testified that he reported each assault and threat to the police and that . . . the police failed to respond to any of his crime reports." *Id.* We therefore concluded that the government of Fiji "could not or would not control" the persecutors. *Id.*; *see also Andriasian v. INS*, 180 F.3d 1033, 1042–43 (9th Cir. 1999) ("[T]he widespread nature of the persecution of ethnic Armenians documented by the State Department Country Report, combined with the police officer's response [advising Mr. Andriasian to leave the

country] when Mr. Andriasian turned to him for help, clearly establishes that the government of Azerbaijan either could not or would not control Azeris who sought to threaten and harm ethnic Armenians living in their country.").

In a published, precedential opinion, the BIA reasoned similarly. In *In re O-Z & I-Z*, 22 I. & N. Dec. 23 (BIA 1998), a father and son, natives of Russia and citizens of Ukraine, were beaten and threatened with death on several occasions because they were Jewish. *Id.* at 23–24. They reported the attacks three times, but the police "took no action beyond writing a report." *Id.* at 26. From that, the BIA concluded that "the Ukrainian [g]overnment was unable or unwilling to control the respondent's attackers and protect him or his son from the anti-Semitic acts of violence." *Id.*

In such instances of police failure to respond to a report of persecution, we have held that a petitioner need not provide evidence that a government is "unable or unwilling to control [persecution] 'on a countrywide basis.'" *Mashiri v. Ashcroft*, 383 F.3d 1112, 1122 (9th Cir. 2004) (rejecting the government's reliance on a U.S. Department of State country report to counter the petitioner's evidence of local police unwillingness to protect her and her family). "Instead, an asylum applicant may meet her burden with evidence that the government was unable or unwilling to control the persecution in the applicant's home city or area."[7] *Id.*

---

[7] Though we explained in *Mashiri* that an applicant can prove governmental inability or unwillingness through evidence specific to her "home city or area," we did not hold that applicants are required to do so.

2. Decisions discussing the "unable or unwilling" standard where private persecution was unreported

As early as 2000, the BIA concluded in a published, precedential opinion that the "unable or unwilling" standard could be established in the absence of a report of the violence or threatened violence to government officials. *In re S–A–*, 22 I. & N. Dec. 1328, 1335 (BIA 2000). There, the BIA addressed the plight of a native and citizen of Morocco, S–A–, who at age fourteen began to suffer regular beatings and was burned, kicked, and punched by her orthodox Muslim father on account of her more liberal Muslim beliefs. *Id.* at 1329–30. Both S–A– and her U.S. citizen aunt credibly testified that going to the police would have been futile, because, "in Moroccan society, such action would [have been] not only unproductive but potentially dangerous." *Id.* at 1330, 1333. The BIA considered that testimony and the U.S. Department of State Country Reports on Human Rights Practices for 1997, which corroborated that few Moroccan women report abuse to the authorities "because the judicial procedure is skewed against them," and that women who reported were often returned to their abusers. *Id.* at 1333.

The BIA found that the credible testimony and country report evidence sufficiently established the "unable or unwilling" standard, reasoning:

> [T]he source of the respondent's repeated physical assaults, imposed isolation, and deprivation of education was not the government, but her own father. Although she did not request protection from the government, the evidence convinces us that even if the respondent had turned to the

> government for help, Moroccan authorities
> would have been unable or unwilling to
> control her father's conduct. The respondent
> would have been compelled to return to her
> domestic situation and her circumstances may
> well have worsened.

*Id.* at 1335. The BIA concluded that, because S–A– had suffered persecution at the hands of her father that the government was unable or unwilling to control, and because the government failed to rebut the presumption of future persecution, S–A– was entitled to asylum. *Id.*; *see also In re Jose Luis Garcia-Gonzalez*, A201 063 604, 2011 WL 7327341, at *1 (BIA Nov. 10, 2011) (unpublished) (finding that Mexico was unable or unwilling to control the applicant's abusive father because "the record reflects that the police did not have a presence in the respondent's small town" and because "the respondent was under 14 years old when the harm occurred").

We have similarly long held that a victim of abuse need not report it to government authorities to establish the government's inability or unwillingness to protect him. In *Korablina v. INS*, 158 F.3d 1038 (9th Cir. 1998), the petitioner, a Jewish native of Russia and citizen of the Ukraine, was the victim of harassment and beatings perpetrated against Jewish citizens. *Id.* at 1041–42. Korablina was fired from the job she had held for twenty-eight years by a new boss who was a member of an ultra-nationalist and anti-Semitic group. *Id.* at 1041. After searching for six months for a new job, she found work as a clerical secretary to a Jewish man. *Id.* at 1042. In that new position, she saw three men attack her boss and thereafter return monthly to the office to extort money. *Id.* Though she

and her fellow employees reported the beating to the police, the officers never appeared, and when Korablina sought help from a friend at the municipal city hall, the friend disappeared. *Id.* Korablina then began receiving anti-Semitic death threats that warned of retaliation if she reported the threats to anyone. *Id.* Soon thereafter, two men violently attacked Korablina and left her barely breathing, telling her she "could not . . . conceal her Jewish origin." *Id.*

Though Korablina never reported the threats or the attack, she credibly testified that "the police were not interested in protecting Jews," that reporting "would be fruitless," and that she was frightened that if she reported she would share the same fate as her friend in the municipal city hall. *Id.* Korablina's daughter also credibly testified that "telling the authorities was useless," which was why neither she nor her father reported the violent anti-Semitic attacks that they had suffered. *Id.* at 1042–43. Furthermore, Korablina offered "articles detailing the authorities' unresponsiveness to complaints made by Jewish victims in Kiev." *Id.* at 1043. We determined that the credible testimony and corroborating articles were enough to establish that the government was unable and unwilling to control the private acts of violence, and noted that "[c]onspicuous by its absence [was] any authoritative evidence from the government disputing the thrust of her evidence and of the government's complicity." *Id.* at 1045.

In *Reyes-Reyes v. Ashcroft*, 384 F.3d 782 (9th Cir. 2004), we first expressly suggested that a per se reporting requirement was untenable. *Id.* at 789 & n.3. In *Reyes-Reyes*, we considered the past persecution of an El Salvadoran "homosexual male with a female sexual identity" who had been beaten and raped at age thirteen because of his

sexual orientation and identity. *Id.* at 785. Though we "decline[d] to reach" Reyes's argument that the IJ had incorrectly imposed a per se reporting requirement, we nevertheless stated that such a bright-line rule "would indeed be troubling, especially in light of evidence in the record that rape victims in El Salvador regularly underreport such crimes due to the poor response of the authorities," as well as circuit precedent documenting physical attacks against homosexuals by national police in Latin America. *Id.* at 789 & n.3.

Two years later, we squarely held:

> [A]n applicant who seeks to establish eligibility for withholding of removal under section 1231(b)(3) on the basis of past persecution at the hands of private parties the government is unwilling or unable to control need not have reported that persecution to the authorities if he can convincingly establish that doing so would have been futile or have subjected him to further abuse.

*Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006). We thus "ma[d]e explicit" what may have been only implicit in *Korablina*, *Reyes-Reyes*, and *In re S–A–*. *Id.* In *Ornelas-Chavez*, we considered a withholding of removal claim by a Mexican gay male who "suffered a great deal of abuse . . . because of his homosexuality and female sexual identity": he was beaten by his parents and raped by his father's friend, his cousins, and a worker at his grandfather's hacienda. *Id.* at 1054. The BIA denied his request for withholding of removal despite finding his testimony credible, concluding that Ornelas-Chavez failed to establish the government's inability or unwillingness to protect him.

*Id.* at 1055.  In doing so, the BIA cited "only two pieces of evidence: background country conditions and Ornelas-Chavez's failure to report the incident to the authorities."**[8]** *Id.* at 1056.  We held this was legal error in light of Ornelas-Chavez's credible testimony that he did not report the abuse to the police "[b]ecause the same police mistreated and harasse[d] [him]"; that "two of [his homosexual] friends were assassinated," presumably on account of their sexual orientation; and that others had reacted with indifference when he told them about the attacks he suffered.  *Id.* at 1057 (second alteration in original).  We reasoned that disregarding Ornelas-Chavez's credible testimony about why he failed to report his abuse to police "was tantamount to making the reporting of private persecution a sine qua non for the success of [his] withholding of removal claim."**[9]**  *Id.* at 1057.

---

**[8]**  The BIA could not have relied solely on the country conditions reports "unless it specifically held that some or all of Ornelas-Chavez's testimony was not credible in light of the background conditions."  *Id.*

**[9]**  In *Ornelas-Chavez*, we distinguished our decision in *Castro-Perez v. Gonzales*, 409 F.3d 1069 (9th Cir. 2005), which concluded that the petitioner failed to establish that the Honduran government was unable or unwilling to control the man who had raped her, in part because she had not reported the attack.  *Id.* at 1070–72.  Assuming that she was a member of a particular social group, we found the petitioner's reasons for not reporting insufficient.  *Id.* at 1072.  The petitioner had testified only that the police "were not willing to do anything" and that she was afraid her father would beat her.  *Id.*  We also found that the country report in evidence did not conclusively show that the Honduran government would have ignored the report of rape.  *Id.*  In *Ornelas-Chavez*, we explained that *Castro-Perez* was not contrary to our rule that reporting is not required; we simply found the petitioner's reasons for not reporting in *Castro-Perez* insufficient to establish governmental inability or unwillingness to protect her.  *Ornelas-Chavez*, 458 F.3d at 1057–58.

We next took up the "unable or unwilling" standard in a pair of cases argued, submitted, and filed on the same dates by the same panel. In one, *Rahimzadeh v. Holder*, 613 F.3d 916 (9th Cir. 2010), the petitioner, who had received death threats and suffered physical attacks by extremist Muslims in the Netherlands because he was Christian, did not report the violence because his persecutors threatened to kill him and his sister if he did so. In the other, *Afriyie v. Holder*, 613 F.3d 924 (9th Cir. 2010), the petitioner, who was violently attacked on the basis of his Christian religion by Muslims in Ghana, did file a written report with the police and requested protection, but to no avail. Both Rahimzadeh and Afriyie were deemed credible by the agency, but we denied Rahmizadeh's petition and granted Afriyie's.

We began our analysis in both cases by citing our precedent, *Ornelas-Chavez*, and that of the BIA, *In re S–A–*, to correctly recognize that "reporting persecution to government authorities is not essential to demonstrating that the government is unable or unwilling to protect [a petitioner] from private actors." *Afriyie*, 613 F.3d at 931; *see also Rahimzadeh*, 613 F.3d at 921–22. We noted that reporting and police inaction is one means of establishing governmental inability or unwillingness to control the attackers or protect the attacked. *Afriyie*, 613 F.3d at 931; *Rahimzadeh*, 613 F.3d at 921. We also introduced a new construct for analyzing the situation where no report has been made:

> The absence of a report to police does not reveal anything about a government's ability or willingness to control private attackers; instead, *it leaves a gap in proof* about how the government would respond if asked, which

the petitioner may attempt to fill by other methods.

*Rahimzadeh*, 613 F.3d at 922 (emphasis added); *see also Afriyie*, 613 F.3d at 931. We summarized several avenues for filling this "gap," based on a survey of prior case law. We stated that a petitioner could fill the evidentiary gap by: 1) "demonstrating that a country's laws or customs effectively deprive the petitioner of any meaningful recourse to governmental protection," *Rahimzadeh*, 613 F.3d at 921 (citing *In re S-A*, 22 I. & N. Dec. at 1328, 1330, 1332–33, 1335); 2) describing "[p]rior interactions with the authorities," *id.* (citing *Ornelas-Chavez*, 458 F.3d at 1054); 3) "showing that others have made reports of similar incidents to no avail," *id.* at 922 (citing *Afriyie*, 613 F.3d at 932–33); 4) "establishing that private persecution of a particular sort is widespread and well-known but not controlled by the government," *id.* (citing *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000)); or 5) "convincingly establish[ing] that [reporting] would have been futile or [would] have subjected [the applicant] to further abuse," *id.* (third alteration in original) (citing *Ornelas-Chavez*, 458 F.3d at 1058).

We stressed that the "BIA was entitled to rely on all relevant evidence in the record, including [country] reports," to determine whether the "unable or unwilling" standard was met, *Afriyie*, 613 F.3d at 933, and in both decisions we examined all the record evidence to determine whether substantial evidence supported the agency's denial of relief. Indeed, the different outcomes in the cases did not turn on whether the attacks were reported to the police; rather, our decisions turned on the nature and quality of the evidence,

including credible testimony and country reports and all other evidence in the record.

In *Rahimzadeh*, we concluded that the IJ properly treated the absence of a report to authorities as "merely one factor in the assessment of the Dutch government's willingness and ability to control private extremists, not as a per se bar to asylum." 613 F.3d at 922. We concluded that the IJ's finding that "the Dutch authorities in fact would have been willing and able to control Rahimzadeh's attackers was supported by substantial evidence." *Id.* at 923. The 2006 U.S. Department of State Country Report on Human Rights Practices in the Netherlands noted not only that "[Dutch] law provides for freedom of religion," but also that "the government generally respect[s] this right in practice." *Id*. (alterations in original). Specifically, the judicial system provided "effective means" for addressing human rights abuse, and the government had taken "firm action against groups espousing violence in support of an Islamic extremist agenda," *id.*, the very groups that Rahimzadeh described as his persecutors. A second government report, the 2006 U.S. Department of State International Religious Freedom Report, also indicated that the "[g]overnment at all levels sought to protect [the freedom of religion] in full and did not tolerate its abuse, either by governmental or private actors."[10] *Id.* (second alteration in original).

By contrast, in *Afriyie*, we concluded that the IJ's finding that Afriyie failed to establish Ghana's inability or unwillingness to control his attackers or protect him while

---

[10] We noted that "[a]lthough general country-level information is ordinarily insufficient to contradict direct, specific, credited testimony, the IJ did not use the country reports for that purpose." *Id.* (citations omitted).

preaching was not supported by substantial evidence. Although Afriyie was able to file a police report, that said little about whether the police were able to protect him. *Afriyie*, 613 F.3d at 931. Afriyie's credible testimony "indicate[d] [that] the Ghanaian police forces lacked the resources necessary to protect him." *Id.* at 931–32. Afriyie testified that his group had requested protection, but that "the police had only one gun for the entire station." *Id.* at 928. He also testified that police relied on the individuals who were attacked to track down and bring in the perpetrators, and that two murders of his group's members were reported but remained unsolved. *Id.* Afriyie further testified that even if the police could protect him, they required bribes, suggesting their unwillingness to do so. *Id.* Moreover, the country report on which the IJ relied did not state that claims of persecution against Christians were investigated and prosecuted; it only noted that claims of corruption against the police were pursued. *Id.* at 933. There was no evidence in the report that Christians were able to obtain protection, and general statements in the report could not, in any event, contradict Afriyie's specific, direct credible testimony. *Id.* at 933–34.

In the next "unable or unwilling" decision involving nonreporting, *Castro-Martinez*, we interpreted the *Rahimzadeh* and *Afriyie* "gap" construct in the context of a gay, HIV-positive man seeking asylum based on the childhood physical and sexual abuse he suffered "because of his homosexuality and feminine characteristics." 674 F.3d at 1079. Castro credibly testified that he never told his parents about the repeated, brutal rapes he suffered between the ages of six and ten because the abusers threatened that if he did so, they would beat him and kill his parents. *Id.* He further credibly testified that "given these threats, and the stigma

associated with homosexuality in Mexico, it would have been unreasonably dangerous for him to have reported the sexual abuse to his teachers, neighbors, or parents." *Id.* Moreover, because the Mexican police might themselves abuse him on account of his sexual orientation and were ineffective in dealing with the persecution of homosexuals, it would have been futile and dangerous to go to the police. *Id.* at 1079, 1081. Castro backed up this credible testimony by presenting "country reports documenting police corruption and participation in torture, abuse, and trafficking, as well as incidents of police harassment of gay men." *Id.* at 1081.

We stated that "[w]e have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now." *Id.* We also acknowledged that, with respect to Castro's petition, "the matter is complicated by the fact that Castro was between the ages of six and ten years when the attacks *occurred*," and we cited *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1046 (9th Cir. 2007), for the proposition that "when the petitioner is a child, the IJ must assess the alleged persecution from a child's perspective." *Castro-Martinez*, 674 F.3d at 1081 (emphasis in original).

Nevertheless, though the credible testimony and country report evidence met the types of evidence that we held in *Rahimzadeh* and *Afriyie* would fill the evidentiary "gap" created by not reporting, we determined the evidence was insufficient. We stated that "Castro's primary reason for not contacting authorities was that he believed the police would not have helped him." *Id.* This, we held, "without more, [was] not sufficient to fill the gaps in the record." *Id.* In denying Castro relief, we also relied on the lack of evidence in the record that "Mexican authorities would have ignored

the rape of a young child or that authorities were unable to provide a child protection against rape." *Id.* Further, we dismissed country report evidence of police harassment of gay men, stating that "none of these reports compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male." *Id.*

We again addressed a petitioner's claim of past persecution on account of his sexual orientation where the violence was not reported in *Vitug v. Holder*, 723 F.3d 1056 (9th Cir. 2013). Thirty-seven-year-old Vitug credibly testified that he was "beaten five times on the street, and two of these beatings were 'severe'"; that he was "harassed and threatened by the police because of his perceived sexual orientation"; and that he was "unable to obtain employment in the Philippines." *Id.* at 1064. He also credibly testified that the "police [in the Philippines] will not do anything to help gay men who report abuse," and that "it is well known in the Philippines that police harass gay men and turn a blind eye to hate crimes committed against gay men." *Id.* at 1064–65 (alteration in original). He bolstered this credible testimony with "documentary evidence of a police raid on a gay theater during which police beat and robbed the patrons." *Id.* at 1065.

In *Vitug*, we did not apply, or even mention, the *Rahimzadeh* and *Afriyie* "gap" construct. Rather, we held that Vitug's credible testimony and documentary evidence of police abuse of homosexuals "'convincingly establish[ed] that [reporting the attacks] would have been futile or have subjected him to further abuse,' thereby demonstrating that the government was unwilling to control the attackers." *Id.*

(alterations in original) (citing *Ornelas-Chavez*, 458 F.3d at 1058).

## D. Castro-Martinez

### 1. Introduction of a heightened evidentiary standard for children

To determine whether private persecutors are individuals whom the government is unable or unwilling to control, we must examine "all relevant evidence in the record, including [country] reports." *Afriyie*, 613 F.3d at 933. The useful survey from *Rahimzadeh* of the types of evidence that may establish the "unable or unwilling" prong of the test for past persecution is not, and never was, an exhaustive list. Like all other circuits to consider the question, we do not deem the failure to report to authorities outcome determinative, and we consider all evidence in the record. *See Castillo-Diaz v. Holder*, 562 F.3d 23, 27–28 (1st Cir. 2009) (holding that where petitioner failed to report her rape to authorities, the IJ properly relied on evidence in a State Department report that El Salvador enforces its rape laws with significant penalties to conclude the country was able and willing to protect petitioner); *Cardozo v. Att'y Gen.*, 505 F. App'x 135, 138–39 (3d Cir. 2012) (unpublished) (citing *Ornelas-Chavez* for the proposition that "an applicant 'need not have reported th[e] persecution to the authorities if he can convincingly establish that doing so would have been futile or [would] have subjected him to further abuse'" (alteration in original) (quoting *Ornelas-Chavez*, 458 F.3d at 1058)); *Vahora v. Holder*, 707 F.3d 904, 908–10 (7th Cir. 2013) (same); *Ngengwe v. Mukasey*, 543 F.3d 1029, 1035–36 (8th Cir. 2008) (holding that substantial evidence did not support the IJ's finding that Cameroon was able and willing to protect a

nonreporting petitioner, where petitioner's credible testimony explaining that the police do not protect women from domestic violence, the State Department country reports, and a relative's affidavit evidenced that Cameroon would "not do anything" to protect her, citing *In re S–A–*); *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007) (holding that the BIA erred by reasoning "that the failure to seek protection without more is enough to defeat a claim for asylum," and remanding to the BIA to consider in the first instance petitioner's testimony and country reports, applying *In re S–A–*).

Whether a victim has reported or attempted to report violence or abuse to the authorities is a factor that may be considered, as is credible testimony or documentary evidence explaining why a victim did not report. *Rahimzadeh* and *Afriyie* unnecessarily introduced the construct that the failure to report creates a "gap" in the evidence, because our law is clear that the agency, and we, upon review, must examine all the evidence in the record that bears on the question of whether the government is unable or unwilling to control a private persecutor. Framing the question of nonreporting as a "failure" that creates an evidentiary "gap" had the inadvertent effect of heightening the evidentiary standard beyond the traditional types of proof, accepted in every prior precedent, that we have deemed sufficient to demonstrate governmental inability or unwillingness to protect victims of persecution. To the extent that our cases' discussion of gap filling suggested that the burden of proof on governmental inability or unwillingness to protect was something beyond the standard we use for other elements—proof by a preponderance of the evidence, considering all the evidence in the record—we supersede those cases by clarifying that

there is no heightened proof requirement.[11]  The very next petition for review that we considered in the context of nonreporting was *Castro-Martinez*, which transformed the "gap" into a "gulf," never to be quite filled, especially for those who were victimized as children, the least likely persons to report their abuse to authorities.

In *Castro-Martinez*, Castro adduced credible testimony detailing the rapes he suffered as a child on account of his sexual orientation and feminine characteristics, the risk of retaliation from both his abusers and the police if he reported his abuse, and country reports documenting private and police harassment of and violence against homosexuals.  Despite all this evidence, we held that Castro failed to meet his burden to "fill in the gaps" because he had not shown that Mexican officials were unable or unwilling to intervene specifically in the abuse of gay children, as opposed to gay individuals generally.  *Castro-Martinez*, 674 F.3d at 1081–82.  Yet the nature and quality of Castro's evidence fell within several of the categories of proof that we said in *Rahimzadeh* would suffice, and which should have been sufficient to satisfy the "unable or unwilling" standard under the correctly applied law.

By effectively defining Castro's social group as gay children and rejecting Castro's evidence, we "demand[ed] an unwarranted level of specificity" and "effectively eliminated

---

[11] Thus the linchpin of the dissent—that this opinion departs from the substantial evidence standard—is misguided.  This opinion merely clarifies that the legal standard, substantial evidence, is not heightened or made more stringent when the persecution is directed to a child, as opposed to an adult, who does not report the persecution to the authorities.  The BIA applied the wrong legal standard, which it drew from the standard we incorrectly applied in *Castro-Martinez*.

[country reports] as a method of showing a foreign government's inability or unwillingness to prevent sexual abuse of gay children." *Bringas-Rodriguez*, 805 F.3d at 1192 (Fletcher, J., dissenting). Castro's evidence demonstrated the futility and potential danger of reporting to the authorities, *Ornelas-Chavez*, 458 F.3d at 1058, and the widespread tolerance of private persecution of homosexuals by the authorities, *Rahimzadeh*, 613 F.3d at 922, but we held that evidence insufficient. We imposed a higher burden that required Castro to demonstrate that "Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape." 674 F.3d at 1081. The result of this holding was to carve out a sub-group of "gay children" within the broader social group of "gay individuals." It also necessarily and erroneously assumed that where government authorities are able and willing to protect heterosexual children, they will be equally able and willing to protect children who exhibit a different sexual orientation or are "different" in other ways. However, our immigration laws recognize that persons who fall within the enumerated, protected refugee categories are often treated more harshly by the authorities than those who do not, precisely because of the characteristics that provided them with statutory protection under our refugee laws in the first place.

Furthermore, adult and child victims of physical and sexual abuse alike face significant barriers to reporting their abuse and seeking the protection of authorities. Sexual abuse commonly results in "severe and long-lasting" effects, including "avoidance of situations that trigger memories of the violation, profound feelings of shame, [and] difficulty remembering events." *Lopez-Galarza v. INS*, 99 F.3d 954, 962 (9th Cir. 1996) (quoting Shana Swiss & Joan E. Giller,

*Rape As a Crime of War: A Medical Perspective*, 270 J. Am. Med. Ass'n 612, 614 (1993)). As was the case with Bringas, a victim may also fear retaliation, not just from his abusers, but from "police, society, even family members."

The barriers to reporting become even greater when the victim is a child. As Judge W. Fletcher noted in his dissent from the panel-majority opinion:

> Many children will not report these crimes for some of the same reasons Bringas-Rodriguez did not. Abusers often threaten their victims with harm if they tell anyone, and they sometimes make good on those threats. Children also have difficulty getting information to the police, especially if family members or neighbors—the people who might report the abuse—are the abusers.

*Bringas-Rodriguez*, 805 F.3d at 1192 (Fletcher, J., dissenting). Children may lack the cognitive ability to understand that they are being abused, and that beatings and rapes by adults they should be able to trust are crimes. Brief for Kids in Need of Defense et al. as Amici Curiae at 11. Even if they do have that cognitive ability, child victims may not only fear retaliation for reporting to authorities, but may also be practically unable to do so because their day-to-day actions are controlled by their abusers, especially if their abusers are family members. Child victims of sexual abuse frequently "lack the information to navigate official, often complex, channels required to report abuse" and are likely to be unaware of shelters or agencies that might provide them protection. *Id.* at 9–10. Asylum officers' training guidelines specifically require them to consider the difficulty children

may experience in reporting abuse: "The fact that a child did not seek protection in his or her country of origin does not necessarily undermine his or her case. The asylum officer must explore what, if any, means the child had of seeking protection." U.S. Citizenship and Immigr. Servs., *Asylum Officer Basic Training Course: Guidelines for Children's Asylum Claims* 40 (2009).[12]

Even if a child is able to report the abuse, he may not be able to articulate what happened to the police "in the same way as adults," and, as a result, "may be more easily dismissed or not taken seriously by the officials concerned." UNHCR, *Guidelines on International Protection: Child Asylum Claims Under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees*, ¶ 39, U.N. Doc HCR/GIP/09/08 (Dec. 22, 2009).[13]

For all of these reasons, we recognize that children who suffer sexual abuse are generally unlikely to report that abuse to authorities. Because they are unlikely to report, it is similarly unlikely that country reports or other evidence will be able to document the police response, or lack thereof, to the sexual abuse of children. Placing on Castro the added burden of demonstrating governmental inability or unwillingness to control child sexual abuse generally was thus tantamount to imposing a reporting requirement on sexually abused children: either the petitioner must have

---

[12] *Available at* http://www.uscis.gov/sites/default/ files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/AO BTC%20Lesson%20Plans/Guidelines-for-Childrens-Asylum-Claims-3 1aug10.pdf.

[13] *Available at* http://www.unhcr.org/50ae46309.pdf.

reported in his own case, or other children must have reported to create the basis for a country report on the general response.[14] That added burden was inappropriate, both because it reflected a heightened gap-filling proof requirement and because it focused on evidence regarding the treatment of gay children rather than the treatment of gay Mexicans generally.

### 2. Overemphasis on laws as opposed to practices

In *Castro-Martinez*, we also failed to consider the difference between a country's enactment of remedial laws and the eradication of persecutory practices, often long ingrained in a country's culture. Rejecting Castro's claim that, in Mexico, a systematic pattern or practice of persecution against homosexuals remained, we found Castro's evidence unpersuasive "in light of recent country reports," which showed that the "Mexican government's efforts to prevent violence and discrimination against homosexuals . . . ha[d] increased in recent years." *Castro-Martinez*, 674 F.3d at 1082.

Mexico is to be lauded for its efforts. But it is well recognized that a country's laws are not always reflective of actual country conditions. It is not unusual that a country's "*de jure* commitments to LGBTI protection do not align with the *de facto* reality of whether the State is able and willing to provide protection." Brief for UNHCR as Amicus Curiae at 4. And we have recently recognized that Mexico has

---

[14] We have imposed such a heightened burden in two decisions only, *Castro-Martinez* and the *Bringas-Rodriguez* panel-majority opinion. Both involved past persecution of a child. We have never imposed such a standard in a petition involving an adult's claim of past persecution.

experienced "an *increase* in violence against gay, lesbian, and transgender individuals during the years in which greater legal protections have been extended to these communities." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1081 (9th Cir. 2015) (emphasis in original).

Moreover, the anti-discrimination efforts discussed in *Castro-Martinez* seem to have been made by the national government, and thus do not necessarily reveal anything about the practices within state or municipal jurisdictions. *See Madrigal v. Holder*, 716 F.3d 499, 507 (9th Cir. 2013) (noting that while Mexico's national government was willing to control the drug cartel that attacked the petitioner, it was not necessarily able to do so, in part because state and local officials were involved with drug traffickers).[15]

## IV.

Substantial evidence compels the conclusion that Bringas has established past persecution.

---

[15] It bears noting, however, that—contrary to the panel majority's putative requirement that Bringas show that he would be persecuted in his hometown—even though actions at the national and local levels may not always align, an applicant is not required to present evidence of local practices to establish that the government was unable or unwilling to protect him. We have rejected such a requirement in the past. *See Krotova v. Gonzales*, 416 F.3d 1080, 1083, 1087 (9th Cir. 2005) (examining country report evidence of police failure to arrest anti-Semitic attackers throughout Russia); *Yan Rong Zhao v. Holder*, 728 F.3d 1144, 1148 (9th Cir. 2013) (municipal-level proof of government persecution not required where the petitioner presented province-level proof). Rather, we must assess the entire evidentiary record in each application, and we do not deem the presence or lack of any specific type of evidence conclusive.

*A. Persecution on Account of a Protected Ground*

There is no dispute that the brutal beatings and rapes that Bringas suffered as a child rise to the level of persecution. "It is well established that physical violence is persecution under 8 U.S.C. § 1101(a)(42)(A)." *Li v. Holder*, 559 F.3d 1096, 1107 (9th Cir. 2009).

Likewise, there is no real dispute that Bringas's sexual orientation was at least one central reason for his persecution. As the BIA acknowledged, "sexual orientation and sexual identity can be the basis for establishing a particular social group." *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1087–88 (9th Cir. 2005) (holding that "homosexual men in Mexico" constitute a particular social group for purposes of asylum); *Karouni v. Gonzales*, 399 F.3d 1163, 1171–73 (9th Cir. 2005) (concluding that the petitioner was eligible for asylum because of a well-founded fear of persecution on account of his "membership in the particular social group of homosexuals").

The government argues that the BIA rejected Bringas's claim because he failed to establish that the sexual abuse he suffered was on account of his homosexuality. The government reads the BIA's decision as affirming the IJ's finding that the sexual predators who attacked Bringas were pedophiles motivated by perverse sexual urges. But the BIA did not adopt the IJ's decision, and nothing about the BIA's decision suggests that it denied Bringas's claim on nexus grounds. Rather, by acknowledging the abuse Bringas suffered as a child, and then immediately pivoting to *Castro-Martinez*, the BIA's reasoning could only have been that, as in *Castro-Martinez*, Bringas's claim failed for want of proof that the government was unable or unwilling to control his

abusers. Indeed, the BIA decision's following three paragraphs discuss homosexuals as "a particular social group" and acknowledge that Bringas is a gay man.

Finally, even if we read the BIA's decision to conclude that the IJ's "perverse desire" finding was not clearly erroneous, the entire record compels the conclusion that at least one central reason for Bringas's persecution was his sexual orientation. Indeed, there is no evidence in the record suggesting Bringas's abusers were motivated by anything else; to find otherwise would be to effectively rule that children can never be victims of abuse on the basis of sexual identity, as such abuse will always be subsumed by a presumption of abuse on grounds unrelated to their protected social group. This cannot be the case. Bringas need only demonstrate that his sexual orientation was "at least one central reason" for the abuse; he need not show it was the only reason. *Parussimova,* 555 F.3d at 741. The record is replete with statements by Bringas's abusers as to exactly why they targeted him. His father chastised him as a child for being effeminate and beat him because he was "different." When Bringas was eight, his uncle told him the reason for the ongoing physical and sexual abuse was his sexuality. Bringas explained that his uncle, his cousins, and his neighbors "called [him] fag, fucking faggot, queer and laughed about it." A full reading of the record leaves no doubt that Bringas was persecuted on account of his sexual orientation.

## B. *Unable or Unwilling to Control Private Persecutors*

Although Bringas's persecutors were private, not government, actors, the record evidence compels the conclusion that the government was unable or unwilling to control them. Bringas was not required to report his abuse to

the authorities because ample evidence demonstrates that reporting would have been futile and dangerous. Bringas volunteered in his asylum application the reason he believed he would be harmed if returned to Mexico:

> If I went to the police they wouldn't do anything. They will take a report and never follow-up on it or they would simply laugh at me and tell me that I got what I deserved because I am gay. My gay friend from Veracruz living in Kansas City told me this is what happened to him.

In his sworn affidavit, Bringas stated: "I was afraid to tell *anyone* about my abuse because my uncle threatened to hurt me and my family." Bringas further explained that when his neighbor sexually assaulted him, "[h]e laughed at [Bringas] and said that if [Bringas] told *anyone*, he would do something [Bringas] would be sorry for." The IJ recognized that Bringas's abusers acted like pedophilic abusers, who "usually manipulate their victims in such a way as to terrify them, and prevent them from going to an adult and reporting the abuse because they want to continue perpetrating their abuse on the victim." Finally, Bringas stated in his affidavit: "The police are no help and cannot protect me. They wouldn't do anything to my abusers. They would laugh at me and tell me I deserved what I got because I was gay. This happened to friends of mine in Veracruz."

At his removal hearing, Bringas testified that he did not tell *anybody* about the abuse because he was afraid that his abusers would hurt him, his family, and the person he chose to tell. Bringas further testified that he was afraid to return to Mexico because he would get "beat up by police, society,

even family members." The IJ and Bringas then had the following exchange:

> IJ: Okay, you're older now. You can go tell police if you return to Mexico and suffer abuse, you could tell the police. . . . Couldn't you do that?

> Bringas: They will do nothing. . . . I know that because when I was living in Kansas,[16] couple of my friends told me that they got raped, they got beat up, like abuse, and they went to the police and they didn't do anything. They even laugh on [sic] their faces.

Thus, even the IJ understood the improbability of a younger Bringas reporting his abuse to the authorities; by stating "you're older now . . . you could tell the police . . . . [c]ouldn't you do that," the IJ recognized the difference between a minor's ability to report and an adult's. Moreover, both the IJ and the BIA found this testimony credible under the heightened standards of the Real ID Act.[17]

---

[16] The panel-majority opinion faults this evidence as not being sufficiently age-specific. However, on his asylum application, Bringas states that he lived in Kansas from 2004 to 2007, that is, from the age of fourteen to seventeen. From that, we can draw the inference that his friends were also minors when they attempted to report in Veracruz.

[17] Though Bringas's report of his friends' experiences was hearsay, we have made clear that hearsay, or even hearsay upon hearsay, can establish asylum eligibility. *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 370 (9th Cir. 2003) (en banc); *Cordon-Garcia v. INS*, 204 F.3d 985, 992–93 (9th Cir. 2000). Bringas's testimony was sufficiently specific to

In addition to his sworn asylum application, affidavit, and credible testimony, Bringas submitted the 2009 and 2010 U.S. Department of State Human Rights Reports for Mexico and several newspaper articles describing the treatment of gay men in Mexico. The 2009 and 2010 reports show official discrimination and violence by police against homosexuals, and show that persecution of gay men remained a serious problem in Mexico five and six years after Bringas fled in 2004. The 2009 report states, "While homosexual conduct experienced growing social acceptance, the National Center to Prevent and Control HIV/AIDS stated that discrimination persisted." The 2010 report includes an identical observation from the National Human Rights Commission. Additionally, the 2009 report describes a particularly severe example of discrimination by Mexican officials:

> One of the most prominent cases of discrimination and violence against gay men was that of Agustin Humberto Estrada Negrete, a teacher and gay activist from Ecatepec, Mexico State. In 2007 he participated in a gay rights march wearing a dress and high heels. According to the NGO Asilegal, soon after the march, Estrada began receiving threatening telephone calls and

---

be deemed credible. Bringas explained through his application and his testimony where he learned about his friends' experiences (Kansas), to whom and where these friends reported the violence against them (the Mexican police in Veracruz), and the types of attacks they had suffered (rape and battery). Inexplicably, neither the BIA nor the IJ discussed this testimony, and the panel majority found it insufficient. While the agency is not required to discuss every piece of evidence, this particular piece was crucial, because it explains why any reporting would have been futile and dangerous.

verbal and physical attacks. In 2008 he was fired from the school for children with disabilities where he worked. After his dismissal, he and a group of supporters began lobbying the government to reinstate him; when they went to the governor's palace to attend a meeting with state officials in May, police beat him and his supporters. The next day he was taken to prison, threatened, and raped. Although he was released, Estrada continued to face harassment by state authorities.

The 2010 country report states that "some public officials continued to perpetrate bureaucratic abuses and some criminal acts with impunity." It also notes that "rape victims rarely filed complaints with the police, in part because of the authorities' ineffective and unsupportive responses to victims."

Bringas additionally offered several newspaper articles, including one in which the Associated Press reported that a "review of more than 70 newspapers in 11 Mexican states" revealed an increase from "an average of nearly 30 killings a year motivated by homophobia between 1995 and 2000" to "nearly 60 a year between 2001 and 2009." Thus, the totality of Bringas's evidence compels the conclusion that reporting his abuse would have been futile and dangerous.

From Bringas's reports, we do see increasing social acceptance of homosexuals in Mexico, especially in certain parts of Mexico, such as Mexico City, where same-sex marriage has been legalized. But the panel-majority opinion, like the *Castro-Martinez* decision and the BIA decision here,

falsely equated legislative and executive enactments prohibiting persecution with on-the-ground progress. Moreover, the new laws depicted in the country reports include a 2010 law legalizing gay marriage in Mexico City, a Supreme Court decision requiring other states to recognize those marriages, and a 2010 law allowing gay couples to adopt children in Mexico City. The question we address here, however, is whether Bringas suffered past persecution in the years preceding 2004. Therefore, these important developments bear little relevance to Bringas's abuse, which ended in 2004.

## V.

Examining all the evidence in the record, and applying long-standing precedent, substantial evidence compels the conclusion that Bringas has proven past persecution due to his identification as a gay individual, and he need not additionally provide evidence specific to him as a gay child. He is therefore entitled to the presumption of a well-founded fear of future persecution.[18] Accordingly, we remand to the

---

[18] The dissent argues that Bringas's fear of future persecution as a gay Mexican man is "unrelated" to his past persecution based on his sexual orientation as a child and thus we cannot presume future persecution under 8 C.F.R. § 1208.13(b)(1). However, it is not the nature of the persecutory acts that must be related for the presumption to arise. Rather, it is the enumerated statutory ground that motivates the persecution that must be related—in other words, the reason for the fear of future persecution must be related to the reason for the past persecution. *Cf. Matter of A–T–*, 24 I. & N. Dec. 617, 622 (A.G. 2008) (recognizing, in the context of a related provision for withholding of removal, that the presumption arises where the fear of future persecution is "on account of the *same statutory ground*" as the past persecution and that the feared

agency for consideration in the first instance of whether the presumption has been rebutted, and for consideration of Bringas's withholding of removal and CAT claims.[19] The respondent, Attorney General Jefferson B. Sessions III, shall bear the costs on appeal.

**GRANTED; REMANDED.**

---

harm need not take a form "identical" to the past harm). Here, the reasons for Bringas's past persecution and his fear of future persecution are the same—his sexual orientation.

[19] Bringas asked the agency to consider his HIV diagnosis, of which he learned after filing his notice of appeal to the BIA. The BIA denied this request, stating that Bringas failed to show "how his status as an HIV positive homosexual changes the outcome of his case." Upon remand, the agency should consider this new information, which is "material" and "could not have been discovered or presented" to the IJ. *Ali v. Holder*, 637 F.3d 1025, 1031–32 (9th Cir. 2011) (quoting 8 C.F.R. § 1003.2(c)(1)); *see also Angov v. Lynch*, 788 F.3d 893, 897 (9th Cir. 2015). Bringas's HIV diagnosis may also be relevant to the question of relocation, which the agency must consider upon remand. *See Boer-Sedano*, 418 F.3d at 1090–91.

CLIFTON, Circuit Judge, concurring in the judgment:

I agree with the conclusion of the majority opinion that the petition for review filed by Carlos Alberto Bringas-Rodriguez should be granted and the matter remanded to the BIA for further proceedings. The basis for my conclusion is much narrower than that adopted by the majority opinion, however. In my view, the majority opinion does not respect the proper standard for our court's review of an order of removal. That standard is supposed to be highly deferential, and I agree with the dissent that it has not been applied that way in this case.

The majority opinion acknowledges that a finding by the IJ is not supported by substantial evidence when "'any reasonable adjudicator would be compelled to conclude to the contrary' based on the evidence in the record." Majority Op. at 13 (quoting *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014)). The majority opinion also agrees that Bringas had the burden of establishing that the persecution suffered by Bringas, in the form of the sexual attacks on him when he was a child, "was committed by . . . forces that the government was unable or unwilling to control." *Id.* at 20 (quoting *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010)).

The evidence offered by Bringas in support of the proposition that the Mexican government was unable or unwilling to control sexual attacks against children was not so overwhelming. That evidence, described in the majority opinion at 43–45 and in the dissent at 72 n.15, amounted in the end to an unspecific hearsay report by Bringas of what he was told by one or two other persons about what had happened when a report was made to police in a different

town.  That evidence would have been sufficient to support a conclusion that a report by a child to the police would have been futile, but it was not so powerful that no reasonable adjudicator could have found to the contrary.  The same is true about the more general evidence offered by Bringas from country reports and newspaper articles about discrimination against gay men and homophobic violence in Mexico.  That general evidence did not speak directly to the kind of violence suffered by Bringas.  It did not say so much about how the Mexican government would have reacted that it would have compelled any reasonable adjudicator to agree with the majority opinion's own assessment.

The reason that I conclude that the petition for review should be granted is that the agency appeared to disregard the evidence that Bringas offered on the subject.  The IJ stated in his oral decision that

> [W]e certainly do not have any evidence whatsoever that the police in Mexico or the authorities do not take any action whatsoever to offer some type of protection against the abuse of children, sexually, whether the sexually abused child is a male or female, or whether the abuser is a male or a female. There is no evidence of that, so I cannot really conclude that the government was unwilling or unable to offer [Bringas] protection from the sexual abuse perpetrated upon him as a child.

The BIA's conclusion was more general, stating that the "evidence does not establish" that the Mexican government is unwilling or unable to control private violence against

homosexuals. But the BIA did not correct the IJ's finding that there was "no evidence whatsoever" to support Bringas's contention that a police report would have been futile, and it did not reflect any awareness of the evidence to that effect. In my view, the failure to recognize that evidence and to account for it in the decision justifies remand to the agency for further proceedings, including further consideration of the question of whether Bringas suffered past persecution. I would grant the petition for review, but I would not dictate the answer to that past persecution question.

BEA, Circuit Judge, with whom O'SCANNLAIN, Circuit Judge, joins, dissenting:

I respectfully dissent from the majority opinion because it usurps the power of the Board of Immigration Appeals (BIA) to determine facts. It does this by reciting, but ultimately departing, from the "substantial evidence" standard which states that agency "findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added).[1]

Here, the BIA found unpersuasive Bringas's evidence of the Mexican government's inability or unwillingness to

---

[1] *See Lianhua Jiang v. Holder*, 754 F.3d 733, 740 (9th Cir. 2014) ("Given the extremely deferential [substantial evidence] standard of review, anything approaching a de novo review is improper."); *Cole v. Holder*, 659 F.3d 762, 780 (9th Cir. 2011) ("We have held that '[t]his strict [substantial evidence] standard bars the reviewing court from independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown.' *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994). 'We are not free to look anew at the testimony and then measure the soundness of the agency's decision by what we would have found. Nor does evidence compel the opposite conclusion just because it would also support a different result.' *Donchev v. Mukasey*, 553 F.3d 1206, 1213 (9th Cir. 2009)."); *Quon v. Gonzales*, 428 F.3d 883, 890–91 (9th Cir. 2005) (O'Scannlain, J., dissenting) ("[W]e must accept the IJ's finding of fact unless the evidence *compels* a contrary conclusion. This is an extremely deferential standard of review: it is not enough that the evidence supports a contrary conclusion, that the panel would have weighed the evidence differently, or even that the panel is persuaded that the finding is incorrect; the evidence must be so overwhelming that not just the panel but '*any reasonable adjudicator* would be *compelled* to conclude the contrary.' The law and the Supreme Court are unequivocal on this point." (internal citations omitted)).

control and prevent the abuse of homosexuals. The record evidence—uncorroborated hearsay testimony by Bringas's friends that police in Veracruz failed to respond to reports of homosexual abuse; newspaper articles which document an average of fewer than sixty murders per year of homosexuals in Mexico, with no evidence at all regarding how the Mexican government responded to those murders; a *single* instance of the persecution of a homosexual man by Mexican government officials; and strong evidence of efforts by the Mexican government to protect homosexual citizens—does not compel us to reverse the BIA's finding.[2] We should deny the petition for review.

To reach its conclusion that the record evidence compels the conclusion that Bringas established past persecution, the majority holds that if there is *any* evidence—including uncorroborated hearsay testimony—that a foreign government is unable or unwilling to control persecution by private, not public, individuals, the administrative trier of fact must disdain evidence to the contrary, and must ignore the alien's failure to produce any of the agency-requested corroborating evidence, which our immigration law specifically requires.[3] The effect of this new standard: having

---

[2] *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it—and also compels the further conclusion that [the petitioner] had a well-founded fear that the guerrillas would persecute him *because of* that political opinion." (emphases in original)).

[3] *See* 8 U.S.C. § 1158(b)(1)(B)(i)-(ii) ("The burden of proof is on the applicant to establish that the applicant is a refugee . . . . Where the trier of fact *determines that the applicant should provide evidence that corroborates otherwise credible testimony*, such evidence must be corroborated unless the applicant does not have the evidence and cannot

carried his burden of presentation of evidence, the alien is

reasonably obtain the evidence."). The Immigration Judge (IJ) asked Bringas's counsel for corroborating details to support Bringas's claim that the Mexican government was unable or unwilling to control Bringas's private persecutors, and even granted Bringas a 120-day extension to provide such corroborating details. During one of the hearings before the IJ, the IJ made the following comments to Bringas's attorney: "If I were an attorney, I'd go for the corroboration because, I mean, to me, it's a lot more important to make sure your case is presented with all the adequate proof, rather than risk that in order to see if you are able to beat the clock and get a work card." Bringas's attorney at the IJ hearing responded with the following: "Well, let's just go ahead and set it over so that we can provide corroborating evidence. I don't know how successful we're going to be, that's the only problem." Indeed, even after the 120-day extension provided by the IJ, Bringas did not supplement the hearsay testimony of his friend or friends—which was the core of his claim of governmental lassitude before, or contempt to, pleas for government help—with any affidavits from his friends or corroborating details through his testimony, nor with any proofs that he could not "reasonably obtain" the evidence. The evidence the majority points to as corroborating evidence to refute this dissent has nothing to do with the corroboration actually requested by the IJ, under 8 U.S.C. § 1158(b)(1)(B)(ii). The IJ required evidence to corroborate Bringas's claim the Mexican government was unable or unwilling to control Bringas's private persecutors. The State Department 2010 Country Report is silent on that score, as are the newspaper articles. They contain reports of incidents, but say nothing about the Mexican government's involvement or reaction to those incidents. Of course, the psychological evaluation of Bringas quite properly tells us about him and his claims, but tells us nothing to corroborate his claims of Mexican government involvement or reaction to incidents of persecution committed by other persons.

discharged from his burden of persuasion.[4] This is not and cannot be the law.

## I.

Carlos Alberto Bringas-Rodriguez is twenty-six years old, homosexual, and a citizen of Mexico. From the ages of four to twelve, Bringas was repeatedly sexually abused by his uncle, cousins, and neighbor in Tres Valles, a town in the Mexican state of Veracruz. At the age of twelve, Bringas moved to Kansas with his stepfather to live with his mother for several months, but within that same year returned to Tres Valles to live with his grandmother. Once back in Tres Valles, the sexual abuse continued. Bringas never reported the abuse to the police. At the age of fourteen, he returned to Kansas with his mother "to escape [his] abusers." He entered the United States without inspection or authorization.

Six years later, at the age of twenty and while living in Colorado, Bringas pleaded guilty to and was convicted of attempted "Contributing to the Delinquency of a Minor."[5]

---

[4] *See* 8 U.S.C. § 1158(b)(1)(B)(ii) ("The testimony of the [asylum] applicant may be sufficient to sustain the applicant's burden without corroboration, *but only if* the applicant satisfies the trier of fact that the applicant's testimony is credible, *is persuasive, and refers to specific facts* sufficient to demonstrate the applicant is a refugee." (emphases added)); *Mejia-Paiz v. INS*, 111 F.3d 720, 722 (9th Cir. 1997) ("[T]he petitioner bears the burden of persuading the IJ that his evidence is credible, and the IJ is entitled to evaluate assertions of past persecution in light of the strength or weakness of such other evidence as the petitioner may present." (internal citations omitted)).

[5] COLO. REV. STAT. § 18-6-701 ("(1) Any person who induces, aids, or encourages a child to violate any federal or state law, municipal or county ordinance, or court order commits contributing to the delinquency

Shortly thereafter, immigration authorities issued him a Notice to Appear. Bringas conceded removability but requested asylum, withholding of removal, and relief under the Convention Against Torture (CAT). He claimed that he had suffered sexual abuse as a minor and that this abuse amounted to past persecution on account of his sexual orientation.

The IJ denied Bringas's asylum claim because it was untimely filed. With respect to withholding of removal, the IJ found Bringas credible but ruled that Bringas had not established past persecution on account of a protected ground for two reasons: (1) The evidence established that the "central reasons for the abuse were the perverse sexual urges of the abusers," not Bringas's sexual orientation, and (2) there was no evidence that the police in Mexico would not have protected Bringas "from the sexual abuse perpetrated upon him as a child." As to Bringas's fear of future persecution, the IJ noted that country reports included a few instances of persecution of homosexuals in Mexico, but not any "pattern or practice" of government participation or acquiescence in such persecution. Moreover, the country reports showed that the country as a whole—and Mexico City in particular—had made significant advances with respect to rights for homosexuals, such that Bringas could potentially relocate to a part of the country where he would be safe. The IJ also denied relief under the CAT on the grounds that Bringas offered insufficient evidence that "torture in the future by the government, or with the acquiescence of the government" was more likely than not.

of a minor. For the purposes of this section, the term 'child' means any person under the age of eighteen years. (2) Contributing to the delinquency of a minor is a class 4 felony.").

The BIA dismissed Bringas's appeal. The BIA denied Bringas's asylum claim on the merits, assuming arguendo that the application was timely filed. The BIA concluded that Bringas failed to establish past persecution because he had not proved that the government was unable or unwilling to control his abusers, avoiding the question whether Bringas established that he was abused because he was homosexual. The BIA also found that Bringas did not have a well-founded fear of future persecution because he failed to prove a "pattern or practice" of persecution against homosexuals in Mexico. Citing this court's opinion in *Castro-Martinez v. Holder*, 674 F.3d 1073, 1082 (9th Cir. 2011), and comparing the experience of homosexual men in Mexico to the experience of homosexual men in Jamaica,[6] the BIA explained that no "widespread brutality against homosexuals or . . . criminalization of homosexual conduct [exists] in Mexico." With respect to withholding of removal, because Bringas failed to satisfy the lower burden of proof required for asylum, the BIA found that he failed to satisfy the higher standard for withholding of removal. With respect to CAT relief, the BIA found no clear error in the IJ's determination that Bringas failed to prove that torture by or with the acquiescence of the Mexican government was more likely than not.

---

[6] In *Bromfield v. Mukasey*, 543 F.3d 1071, 1078 (9th Cir. 2008), the Ninth Circuit granted a petition for review and remanded after finding a pattern or practice of persecution of homosexual men in Jamaica. The evidence compelled such a finding based on a culture of severe discrimination against homosexuals, numerous cases of violence against persons based on their sexual orientation by police and vigilante groups, brutality against homosexuals, as well as Jamaican law criminalizing homosexual conduct, resulting in several prosecutions.

Finally, the BIA rejected Bringas's request to remand his case to the IJ in light of Bringas's recent HIV diagnosis. Bringas's brief to the BIA explained his recent diagnosis and argued that "this fact is significant because it now places [him] in a more vulnerable position should he be returned to Mexico." The BIA declined to remand Bringas's case for further consideration because Bringas had not provided any additional country conditions evidence or specific arguments regarding how his status as an HIV positive homosexual would change the outcome of his case.

Bringas petitioned this court for review of the BIA's decision. The three-judge panel denied Bringas's petition for review. The panel first noted that it could not "resolve Bringas's asylum claim on timeliness grounds because the BIA ignored this procedural defect . . . ." *Bringas-Rodriguez v. Lynch*, 805 F.3d 1171, 1177 (9th Cir. 2015) (now withdrawn); *see also Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc) ("When the BIA has ignored a procedural defect and elected to consider an issue on its substantive merits, we cannot then decline to consider the issue based upon this procedural defect."). In reviewing Bringas's asylum claim on the merits, the panel concluded the evidence did not compel reversal of the BIA's determination that Bringas failed to establish past persecution or a well-founded fear of future persecution. *Bringas-Rodriguez*, 805 F.3d at 1177. The panel followed the BIA and analyzed only whether Bringas failed to establish that his abuse was inflicted by individuals the government was unable or unwilling to control, thereby avoiding the question whether Bringas suffered abuse because he is homosexual. *Id.* at 1177–78.

The panel agreed with the IJ and BIA that Bringas failed to establish that the Mexican government was unable or unwilling to control his abusers, and therefore failed to establish past persecution. *Id.* at 1178. The country reports and hearsay evidence introduced by Bringas did not sufficiently close the gap in proof as to how the government would have responded to reports of his abuse, had such reports been made. *Id.* at 1180–82. With respect to the country conditions evidence, the panel stated that the country reports noted no instances of discrimination or persecution in Veracruz and "*only one* specific example of government persecution on the basis of sexual orientation in Mexico." *Id.* at 1179. The panel highlighted portions of the reports describing "gay pride" marches across Mexico as well as a Mexican Supreme Court decision "requiring Mexico's states to recognize legally performed [same-sex] marriages performed elsewhere," a decision that was made five years before the United States Supreme Court reached a similar conclusion. *Id.* Turning to Bringas's testimony about his friends' experiences in Veracruz, the panel first recognized that Bringas credibly testified that a "couple" of his friends told him "that they got raped, they got beat up, like abuse, and they went to the police [in Veracruz, Mexico] and they didn't do anything" except "laugh [in] their faces." *Id.* at 1178. Nonetheless, the panel concluded that the lack of corroborating details about Bringas's friends' experiences— including the names of his friends, how old they were when they were abused and when they reported their abuse, by whom they were abused, to whom they reported their abuse, or where the abuse occurred—justified the BIA's conclusion that Bringas failed to establish that the government would be

unable or unwilling to control his abusers.**[7]** *Id.* at 1180. The panel therefore held that Bringas was not entitled to a presumption of a well-founded fear of persecution. *Id.* at 1182.

The panel also concluded that Bringas's evidence supported the BIA's conclusion that Bringas failed to establish a well-founded fear of future persecution. *Id.* The panel recognized two avenues for Bringas to establish an objectively reasonable fear of future persecution: (1) that he was a member of a disfavored group against which there was a systematic pattern or practice of persecution, or (2) that he belongs to a disfavored group and has an individualized risk of being singled out for persecution. *Id.* Bringas forfeited the second argument by failing to raise it before the BIA. Therefore, the panel focused only on whether Bringas established a pattern or practice of persecution of homosexual men in Mexico. *Id.* The panel concluded that Bringas adduced no evidence establishing a change of conditions in Mexico since the court decided *Castro-Martinez v. Holder*, 674 F.3d 1073, 1082 (9th Cir. 2011).**[8]** Therefore, the panel held that substantial evidence supported the BIA's finding of no pattern or practice of persecution. *Bringas-Rodriguez*, 805 F.3d at 1183.

---

**[7]** These details were requested of Bringas's counsel, together with a provision of time for their production. *See supra* note 3.

**[8]** In *Castro-Martinez*, this court rejected the claim that "the Mexican government systematically harmed gay men and failed to protect them from violence." 674 F.3d at 1082. Although the court acknowledged evidence of societal discrimination and isolated attacks, as to the required element of governmental lassitude or incapacity, it explained that "the Mexican government's efforts to prevent violence and discrimination against homosexuals . . . ha[d] increased in recent years." *Id.*

With respect to Bringas's CAT claim, the panel held that the same evidence that supported the BIA's dismissal of the pattern-or-practice claim also supported the IJ and BIA's conclusion that Bringas failed to establish a likelihood of torture. *Id.* at 1184. As the panel stated, conditions in Mexico are "insufficiently dangerous for gay people to constitute a likelihood of government-initiated or -sanctioned torture." *Id.*; *Castro-Martinez*, 674 F.3d at 1082. The panel noted that the likelihood of future torture was especially low given that Bringas is now a "selfsufficient [sic] homosexual adult" who could "relocate to a different part of Mexico." *Bringas-Rodriguez*, 805 F.3d at 1184.

Finally, the panel held that the BIA did not abuse its discretion in declining to remand based on Bringas's HIV diagnosis. According to the panel, the BIA offered a reasoned explanation that was neither arbitrary nor irrational: Bringas did not provide "any additional country conditions evidence or specific arguments regarding how his [HIV] status changes the outcome of his case." *Id.* at 1185.

Bringas filed a petition for rehearing en banc, which we granted. A majority of the en banc panel today overrules several of our prior immigration cases in two respects, but only by misreading those cases. First, the majority holds that *Rahimzadeh* and *Afriyie* "unnecessarily introduced the construct that the failure to report [private persecution to government authorities] creates a 'gap' in the evidence, because our law is clear that the agency, and we, upon review, must examine all the evidence in the record that bears on the question of whether the government is unable or

unwilling to control a private persecutor.'"[9] Op. at 35. The majority overrules *Rahimzadeh* and *Afriyie* "[t]o the extent that [the] discussion of gap filling suggested that the burden of proof on governmental inability or unwillingness to protect was something beyond the standard we use for other elements—proof by a preponderance of the evidence, considering all the evidence in the record." Op. at 35. However, neither case held that any "gap" created by the failure to report could not be filled by other evidence. At most, the "gap" language commented on the lack of *one kind of evidence*, which could be supplanted by another kind of evidence. It did not increase the evidentiary burden on the petitioner. For instance, there is no "gap" in establishing the date of a fire loss when the homeowner does not file a report with the Fire Department, if he produces a date-stamped video of his house burning. Similarly, there is no "gap" when an asylum petitioner does not report his persecution by private individuals to government officials, if he produces alternative, compelling evidence that the foreign government at issue is unable or unwilling to control his persecutors.

Second, the majority overrules *Castro-Martinez* because, in that case, "[w]e imposed a higher burden [on Castro, who was persecuted by private individuals as a child] that required Castro to demonstrate that 'Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape.'" Op. at 37 (citing *Castro-Martinez*, 674 F.3d at 1081). The majority holds that this language effectively imposed "a reporting requirement on sexually abused children: either the petitioner must have reported in his own case, or other children must

---

[9] *Rahimzadeh v. Holder*, 613 F.3d 916 (9th Cir. 2010); *Afriyie v. Holder*, 613 F.3d 924 (9th Cir. 2010).

have reported to create the basis for a country report on the general response." Op. at 39–40. However, *Castro-Martinez* stated unequivocally that asylum petitioners, especially children, need not report their abuse to establish past persecution. *See Castro-Martinez*, 674 F.3d at 1081 ("We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now."). Instead of accurately reading *Castro-Martinez*, which needed no clarification with respect to whether a reporting requirement exists for asylum petitioners of any age, the majority removes the requirement imposed by the Supreme Court and Congress on asylum petitioners to produce evidence sufficient to compel the conclusion that the foreign government was unable or unwilling to protect against private persecution. I address the majority's two issues in turn.

## II.

A.   *The majority rejects our substantial evidence standard by holding that merely proffering traditional "types of proof" categorically suffices to establish an "unable or unwilling" claim.*

The majority takes issue with the commonsense conclusion reached in *Rahimzadeh* and *Afriyie* that a petitioner who does not report his private persecution to government officials leaves an evidentiary "gap" regarding how those officials would react to such a report.[10] The

---

[10]   *See Rahimzadeh*, 613 F.3d at 922 ("The absence of a report to police does not reveal anything about a government's ability or willingness to control private attackers; instead, it leaves a gap in proof about how the government would respond if asked, which the petitioner

majority "supersedes" *Rahimzadeh* and *Afriyie* because "[f]raming the question of nonreporting as a 'failure' that creates an evidentiary 'gap' had the inadvertent effect of heightening the evidentiary standard beyond the traditional *types of proof*, accepted in every prior precedent, that we have deemed sufficient to demonstrate governmental inability or unwillingness to protect victims of persecution." Op. at 35 (emphasis added).

The assertion that *Rahimzadeh* and *Afriyie* created a heightened evidentiary standard for petitioners who fail to report their private persecution to government authorities ignores clear language to the contrary from both opinions. *Rahimzadeh* and *Afriyie* made clear that reporting private persecution to government authorities is not required to establish past persecution.[11] *Rahimzadeh* and *Afriyie* also provided clear guidance regarding how evidence other than

---

may attempt to fill by other methods."); *Afriyie*, 613 F.3d at 931 ("'[T]he absence of a report to police . . . leaves a gap in proof about how the government would respond, which the petitioner may attempt to fill by other methods.'" (quoting *Rahimzadeh*, 613 F.3d at 922)). Recognizing that a "gap" exists is not to make it determinant or change the standard of proof which requires all evidence on the matter to be considered. *See Vitug v. Holder*, 723 F.3d 1056, 1064 (9th Cir. 2013) ("[T]he BIA abuses its discretion where it ignores arguments or evidence.").

[11]    *See Rahimzadeh*, 613 F.3d at 921 ("The reporting of private persecution to the authorities is not, however, an essential requirement for establishing government unwillingness or inability to control attackers."); *id.* at 922 ("[I]t is clear that the IJ treated the failure to report as merely one factor in the assessment of the Dutch government's willingness and ability to control private extremists, not as a per se bar to asylum."); *Afriyie*, 613 F.3d at 931 ("We begin by noting that reporting persecution to government authorities is not essential to demonstrating that the government is unable or unwilling to protect him from private actors.").

reports to the police can compel the conclusion that government officials were unable or unwilling to protect petitioners from private persecution.[12] The language from those opinions needed no further clarification.

But the majority does not overrule those cases in an attempt to clarify how this court reviews evidence of past persecution. Instead, the majority recites, yet ignores the standard of review for past persecution claims involving private persecutors.[13] The majority holds that "[f]raming the question of nonreporting as a 'failure' that creates an evidentiary 'gap' had the inadvertent effect of heightening the evidentiary standard beyond the traditional *types of proof*, accepted in every prior precedent, that we have deemed sufficient to demonstrate governmental inability or

---

[12] In *Rahimzadeh* and *Afriyie*, we explained that petitioners who do not report their private persecution to government authorities can establish that government authorities were unable or unwilling to protect them through several evidentiary channels. For example, petitioners could establish that others have made reports of similar incidents to no avail—as Bringas did here in proffering the hearsay statements of his friends as to their insouciant and contemptuous reception by the Mexican police, *see Afriyie*, 613 F.3d at 932–33, or that "private persecution of a particular sort is widespread and well-known but not controlled by the government." *Rahimzadeh*, 613 F.3d at 922.

[13] The majority characterizes its opinion as merely clarifying that "the legal standard, substantial evidence, is not heightened or made more stringent when the persecution is directed to a child, as opposed to an adult . . . ." Op. at 36, n.11. But the majority does not apply the true substantial evidence test to either children or adult petitioners. On this point, the concurrence agrees. *See* Concurring Op. at 50 ("In my view, the majority opinion does not respect the proper standard for our court's review of an order of removal. That standard is supposed to be highly deferential, and I agree with the dissent that it has not been applied that way in this case.").

unwillingness to protect victims of persecution." Op. at 35 (emphasis added). Neither we, nor any other court, has accepted the notion that presentation of a *type of proof* used in other cases, regardless of its probative value, is categorically sufficient to establish that government officials were unable or unwilling to control private persecution. The nature and quality of the evidence adduced always mattered. However, under the majority's view, the probative value of that proof becomes irrelevant when petitioners provide a "*type*[] *of proof*, accepted in every prior precedent, that we have deemed sufficient to *demonstrate* governmental inability or unwillingness to protect victims of persecution." Op. at 35 (emphases added). The majority ignores that an inadequate response by government officials to a petitioner's direct report of private persecution will sometimes provide stronger evidence that government officials are unable or unwilling to protect against private persecution than other types of evidence. Our prior cases recognized this uncontroversial statement regarding the nature of evidence. *See, e.g.*, *Afriyie*, 613 F.3d at 931 ("[W]hen an applicant attempts to report persecution to the police or request protection from them, the authorities' response (or lack thereof) to such requests *may provide powerful evidence* with respect to the government's willingness or ability to protect the requestor." (emphasis added)). *Rahimzadeh* and *Afriyie* did not create a heightened evidentiary burden for petitioners who do not report their persecution. Those cases simply recognized that a petitioner's direct report to government officials, followed by an inadequate or nonexistent response by those officials, provides "powerful" proof that indirect, vague, or hearsay evidence may lack. My colleagues fundamentally alter our longstanding substantial evidence standard of review by suggesting that evidence other than a failure to report persecution to the police—such as Bringas's hearsay

testimony from friends—categorically suffices to constitute compelling evidence that government officials are unable or unwilling to control persecution by private, non-governmental individuals.

B.  *The majority sets aside substantial evidence review by excusing adult petitioners who were persecuted as children from adducing sufficient, alternative evidence that the government was unable or unwilling to protect them.*

My colleagues take issue with the following language in *Castro-Martinez*:

> As the BIA observed, there was no evidence in the record that Mexican authorities would have ignored the rape of a young child or that authorities were unable to provide a child protection against rape. . . . [N]one of [the] reports compel the conclusion that the police would have disregarded or harmed a male child who reported being the victim of homosexual rape by another male.

*Castro-Martinez*, 674 F.3d at 1081. According to my colleagues, this language effectively requires child victims of private persecution to report their abuse to the authorities based on the following reasoning:

> [C]hildren who suffer sexual abuse are generally unlikely to report that abuse to authorities. Because they are unlikely to report, *it is similarly unlikely that country reports or other evidence will be able to*

*document the police response, or lack thereof*, to the sexual abuse of children. . . . That added burden was inappropriate, both because it reflected a heightened gap-filling proof requirement and because it focused on evidence regarding the treatment of gay children rather than the treatment of gay Mexicans generally.

Op. at 39–40 (emphasis added). *Castro-Martinez* addressed this exact issue: whether the victim's report of the abuse to the police was a requirement, else an evidentiary gap would make the rest of the victim's proof insufficient, and whether this requirement obtained only as to homosexual children. *See Castro-Martinez*, 674 F.3d at 1081 ("We have never held that any victim, let alone a child, is obligated to report a sexual assault to the authorities, and we do not do so now."). *Castro-Martinez*'s express language does not permit of a reading that a reporting requirement exists for persecuted children and only for such children rather than similar adults. Nonetheless, the majority concludes that *Castro-Martinez* created a reporting requirement for persecuted children.

The majority is undoubtedly correct that children who suffer sexual abuse are unlikely to report their abuse to government officials of their own accord. The fact that victims of private persecution—young or old—are unlikely to report their abuse to authorities explains why we have never held that victims of private persecution need to report their abuse to establish past persecution for asylum purposes. *See, e.g.*, *Rahimzadeh*, 613 F.3d at 922 ("None of [the immigration cases surveyed], or any other we have found, creates a freestanding reporting requirement to qualify for asylum."). But the majority goes much further than restating

that child victims of private persecution, like all victims of private persecution, need not report their persecution to the authorities. The majority concludes that, because children are unlikely to report, "it is similarly unlikely that *country reports or other evidence will be able to document the police response, or lack thereof*, to the sexual abuse of children." Op. at 39 (emphasis added). In other words, this court should excuse the absence of *any* "country report[] or other evidence" that government officials were unable or unwilling to protect adult petitioners who suffered persecution as a child because children are unlikely to report their private persecution to the authorities.

The majority fails to explain why adults who suffer private persecution at the hands of their family, neighbors, or community are any less likely to report their private persecution to government authorities, and thus less deserving of the majority's lack-of-evidence-be-damned approach. We do not require victims of private persecution to report to government authorities to establish past persecution for asylum purposes because, no matter their age, victims are unlikely to report private persecution given that reporting may be futile or dangerous. *See Afriyie*, 613 F.3d at 931. Nonetheless, our nation's immigration law still requires asylum petitioners to adduce sufficient evidence other than their or others' reports to governmental authorities to prove that those authorities were unable or unwilling to protect asylum petitioners from private persecution. The majority dismisses that requirement for a petitioner who experienced persecution when he was a child—even though the petitioner, as an adult, can reasonably identify other documentary, anecdotal, or statistical evidence to support his "unable or unwilling" claim—because the petitioner was unlikely to report his persecution when he was a child. But adult

petitioners are also unlikely to report their private persecution to authorities, and thus similarly unlikely to obtain "country reports or other evidence" documenting the "police response, or lack thereof" to reports of private persecution. I fear our court will soon excuse the absence of "country reports or other evidence" from asylum petitioners who experienced private persecution as adults under the same reasoning adopted by the majority today. We lack the authority to make such a dramatic shift in our nation's immigration and asylum law. If there is to be a relaxing of our asylum requirements for victims of private persecution, the authority lies with Congress, not this court, to enact it.

## III.

Bringas's evidence does not compel the conclusion that Mexican authorities were unable or unwilling to control Bringas's private persecutors. After reciting, but then lowering our standard of review beyond the bounds set by the Supreme Court in *Elias-Zacarias* and Congress in 8 U.S.C. 1252(b)(4)(B), the majority easily reaches the conclusion that Bringas adduced evidence sufficient to compel the conclusion that Mexican authorities were unable or unwilling to protect him. The majority reaches this conclusion by comparing Bringas's evidence to the evidence presented in other cases in our circuit involving petitioners who suffered private persecution and never reported their persecution to the authorities. Op. at 24–34. However, a careful review of the evidence presented in those cases explains why the *nature and quality* of the evidence adduced by Bringas does not come close to compelling the conclusion reached by the

majority.**[14]** Compared to the evidence in our prior cases,
Bringas's evidence included only vague, unspecific hearsay
testimony describing his friend[s]' experiences with the
police in Veracruz,**[15]** newspaper articles which documented

---

**[14]** *See Korablina v. INS*, 158 F.3d 1038, 1042 (9th Cir. 1998)
(granting the petition for review based on evidence that the petitioner
witnessed the beating of her Jewish boss, whose beating was reported to
the police to no avail, and reported the beating to a friend at the municipal
city hall, who soon thereafter "disappeared"); *Ornelas-Chavez v.
Gonzalez*, 458 F.3d 1052, 1057 (9th Cir. 2006) (granting in part the
petition for review based on credible testimony that (1) the petitioner was
personally mistreated and harassed by police officers, who jailed him and
threatened to do so again if he continued dating men, and (2) police
officers brutally maimed and killed the petitioner's gay friends); *Afriyie*,
613 F.3d at 928–29 (9th Cir. 2010) (granting in part the petition for review
based on credible testimony that (1) the petitioner and others reported to
the police, to no avail, the petitioner's beating by private actors, the
murder of members of his religious group by private actors, and the
murder of the petitioner's sister and destruction of her home, and (2) the
police had only one gun at the police station with which to protect the
petitioner's religious group); *Vitug*, 723 F.3d at 1064 (9th Cir. 2013)
(granting in part the petition for review based on evidence that the
petitioner was personally harassed and threatened by police officers on
account of his sexual orientation).

**[15]** Bringas gave the following credible, hearsay testimony: "[W]hen
I was living in Kansas, couple of my friends told me that they got raped,
they got beat up, like abuse, and they went to the police [in Mexico] and
they didn't do anything. They even laugh on [sic] their faces." Bringas
also stated the following in his asylum application: "If I went to the police
[in Mexico] they wouldn't do anything. They will take a report and never
follow-up on it or they would simply laugh at me and tell me that I got
what I deserved because I am gay. My gay friend from Veracruz living in
Kansas City told me this is what happened to him." Bringas presented
inconsistent statements regarding whether a single "friend" or multiple
"friends" reported to the Mexican police they had been victims of abuse,
all to no avail. Credible hearsay evidence, such as Bringas's friends'
statements, may be admissible in immigration proceedings. *Rojas-Garcia*

isolated incidents of private discrimination and persecution against homosexual individuals in Mexico,[16] and a *single instance* of persecution against a homosexual man by

---

*v. Ashcroft*, 339 F.3d 814, 823 (9th Cir. 2003). The majority places great weight on the fact that "Bringas's testimony was sufficiently specific to be deemed credible." Op. at 45–46 n.17. Here, the majority gives us a concrete example of its usurpation of fact-finding power from the administrative agency to itself. Whether the evidence was "sufficiently" specific was not the majority's call. Whether hearsay testimony was *so* specific as to *compel* it be adjudged credible is the proper standard for judgment. Moreover, the mere absence of an adverse credibility finding does not compel our court to make a finding contrary to the BIA. That would make a hash out of the REAL ID Act of 2005, which *assumes* no adverse credibility finding, but authorizes the trier of fact to *require* corroborating evidence, and in the absence of such corroborating evidence, allows the trier of fact to reject the otherwise credible evidence as of insufficient weight—which is precisely what happened to Bringas. He was given 120 days to buttress his testimony with corroborating details and other evidence. He rejected that opportunity. He gave no explanation as to why he could not produce any of the corroborating evidence requested, even though the statute specifically provides for grounds available to excuse failure to produce the corroboration. *See* 8 U.S.C. § 1158(B)(i)-(ii) ("The burden of proof is on the applicant to establish that the applicant is a refugee . . . . Where the trier of fact *determines that the applicant should provide evidence that corroborates otherwise credible testimony*, such evidence must be corroborated unless the applicant does not have the evidence and cannot reasonably obtain the evidence." (emphasis added)); *see also supra* note 3.

[16] "Bringas additionally offered several newspaper articles, including one in which the Associated Press reported that a 'review of more than 70 newspapers in 11 Mexican states' revealed an increase from 'an average of nearly 30 killings a year motivated by homophobia between 1995 and 2000' to 'nearly 60 a year between 2001 and 2009.'" Op. at 47.

Mexican officials.[17] Our prior cases involving private persecution explain why I cannot join the majority in holding that the evidence here compels the conclusion that Mexican authorities were unable or unwilling to protect Bringas. We have never reached such a conclusion on evidence as weak as that which Bringas presents.

But the majority does not err only by overweighing Bringas's scant evidence that the Mexican authorities were unable or unwilling to protect him. The majority also undervalues evidence of social progress in Mexico regarding rights for homosexual individuals in a manner that defies logic. The majority first summarizes the relevant evidence of social progress in Mexico identified by the panel in *Bringas-Rodriguez v. Lynch*, 805 F.3d 1171 (9th Cir. 2015) (now withdrawn):

> [T]he [three-judge] panel majority found that the country reports demonstrated that Mexico permitted gay pride marches and had expanded marriage equality. The panel majority also cited a United Nations report stating that Mexico had established a

---

**[17]** "In 2007, [Agustin Humberto Estrada Negrete] participated in a gay rights march wearing a dress and high heels. According to the NGO Asilegal, soon after the march, Estrada began receiving threatening telephone calls and verbal and physical attacks. In 2008 he was fired from the school for children with disabilities where he worked. After his dismissal, he and a group of supporters began lobbying the government to reinstate him; when they went to the governor's palace to attend a meeting with state officials in May, police beat him and his supporters. The next day he was taken to prison, threatened, and raped. Although he was released, Estrada continued to face harassment by state authorities." Op. at 46–47.

"'specialized hate crime prosecution unit[],' developed a 'new judicial protocol to guide adjudication of cases involving human rights violations on grounds of sexual orientation,' implemented specialized training for police officers, and officially designated May 17 as 'National Day Against Homophobia.'"

Op. at 11 (internal citations omitted). The majority holds that, despite this evidence of progress, as countries like Mexico successfully improve conditions for particular social groups eligible for asylum, any private backlash that results from such government-sponsored improvements should be interpreted by this court as evidence that the foreign government is in fact "unable or unwilling" to protect that particular social group. *See* Op. at 9 ("The reports showed that the violence rose even as—and perhaps because—Mexican laws were becoming increasingly tolerant of gay rights."). In other words, as countries become *more* able and willing to protect a particular social group, the trier of fact must disregard that evidence of social progress and conclude that countries are in fact *less* able and willing to protect particular social groups when isolated incidents of private persecution occur. The majority does not provide any limiting principle regarding when our court should begin to accept evidence of the significant progress of foreign countries in protecting its most vulnerable citizens, or explain why evidence of an average of less than 60 homophobia-motivated murders a year committed by private actors in Mexico between 2001 and 2009 permits a conclusion that the Mexican government, overseeing a country of more than 120

million people, is unable or unwilling to protect its homosexual citizens.[18]

The majority alternatively sets aside the evidence of Mexico's social progress advancing the rights of homosexuals because the evidence reflects changes made after the period during which Bringas was abused, which ended in 2004. Op. at 48. Of course, the same can be said about most of the evidence Bringas relies on to support his claim that Mexican police were unable or unwilling to protect him before 2004. The country reports are from 2009 and 2010. The single example of police violence against a homosexual man occurred in 2008. The newspaper articles were published in 2010. Using the majority's reasoning, the only relevant evidence adduced by Bringas was hearsay testimony regarding his homosexual friend[s]' experiences with the police in Mexico, and a single article documenting the number of murders committed by private actors each year between 1995 and 2009 that were motivated by homophobia, with *no discussion whatsoever* of how Mexican police responded to those private acts. Even under the relaxed

---

**18** *See* CIA, THE WORLD FACTBOOK (2016), *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/mx.html (estimating Mexico's population to be 123,166,749 as of July 2016). The majority's conclusion that an average of fewer than 60 homophobia-motivated a murders a year in a country of 120 million people compels the conclusion that the Mexican government is unable or unwilling to protect its homosexual citizens is especially confounding given that the *same article* which documents those murders goes on to discuss the Mexican government's "radio campaign in 2005 to promote tolerance of homosexuals," the laws passed in Mexico City which elevated homosexual marriage to the same status as heterosexual marriage and allowed same-sex couples to adopt children, and Mexico City's annual "gay pride parade."

standard of review adopted today, Bringas's evidence does not compel the conclusion reached by the majority.

## IV.

Even if I agreed with the majority that the evidence here compelled the conclusion that Bringas suffered past persecution, I would still dissent on the basis that the past persecution purportedly established here does not entitle Bringas to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(a)(1) states, in relevant part, that "[i]f the applicant's fear of future persecution is *unrelated* to the past persecution, the applicant bears the burden of establishing that the fear is well-founded." (emphasis added). The majority responds by noting that Bringas's fear of future persecution on account of his sexual orientation is clearly related to his past persecution on account of his sexual orientation. But the only private persecution Bringas ever experienced in Mexico on account of his sexual orientation was when he was a child to age fourteen, and at the hands of his uncle, cousins, and neighbor, all of whom lived (and presumably still live) in Tres Valles, Veracruz, Mexico. Given the isolated location of Bringas's abuse, and given the fact that Bringas is no longer a child subject to the oversight and control of his family and neighbors in Tres Valles, I would hold that Bringas's past persecution is unrelated within the meaning of 8 C.F.R. § 1208.13(a)(1), and does not entitle him to the presumption of a well-founded fear of future persecution. I would further deny Bringas's petition for review because he has not carried his burden to establish that the evidence compels a finding of a well-founded fear of future persecution, as explained in the well-reasoned opinion of the three-judge panel. *See Bringas-*

*Rodriguez,* 805 F.3d 1171, 1182–84 (9th Cir. 2015) (now withdrawn).[19]

Assuming, as the majority does, that Bringas's past persecution entitles him to a presumption of a well-founded fear of future persecution, the majority acted correctly in remanding to the agency "for consideration in the first instance of whether the presumption [of a well-founded fear of future persecution] has been rebutted." Op. at 49. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002). On remand, the agency may well conclude that Mexico's significant progress regarding rights for homosexuals constitute changed conditions sufficient to rebut the presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1)(A) (stating that a "fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality" may rebut the presumption of a well-founded fear of future persecution). Or the agency may conclude that

---

[19] In *Matter of A –T–*, 24 I. & N. Dec. 617, 621 (A.G. 2008), the BIA held that a female asylum petitioner who had undergone female genital mutilation against her will in Mali was not entitled to the presumption of a well-founded fear of future persecution because there was no chance that she would be personally persecuted again by the procedure. The Attorney General vacated the BIA decision, and stated that "where an alien demonstrates that she suffered past persecution on account of one of the statutory bases, it is 'presumed' that her life or freedom would be threatened in the future 'on the basis of the original claim'—in other words, on account of *the same statutory ground*." *Id.* at 622. However, the Attorney General based his decision on the fact that "female genital mutilation is indeed capable of repetition," and that the petitioner's fear of future persecution was therefore related to her past persecution. *Id.* at 621–22. Here, Bringas has not adduced evidence that his past persecution is related to a fear of future persecution, given the nature of his abuse and the identity of his persecutors.

Bringas, now a financially self-sufficient adult, who has been employed in the United States not only in entry-level positions in the food service industry, but in at least one supervisory position, can reasonably and safely relocate to a new area within Mexico, such as Mexico City, where he would be safe from the only private individuals in Mexico who have ever persecuted him on account of his sexual orientation. *Id.* § 1208.13(b)(1)(i)(B). Assuming arguendo that Bringas's past persecution entitles him to the presumption of a well-founded fear of future persecution, however, I agree with the majority that we must leave these questions to the agency in the first instance on remand.[20]

---

[20] In a footnote at the end of its opinion, the majority states that "[u]pon remand, the agency should consider [Bringas's HIV diagnosis], which is 'material' and 'could not have been discovered or presented' to the IJ." Op. at 49 n.19 (internal citations omitted). After Bringas filed his notice of appeal of the IJ's decision, he claims that he was diagnosed with HIV. Bringas requested that the BIA remand to the IJ to consider Bringas's HIV-positive status in his applications for relief. Bringas's brief to the BIA included only one line stating that his HIV status is significant because it places Bringas in a "more vulnerable position should he be returned to Mexico." The BIA declined to remand to the IJ. This decision was not an abuse of discretion. *See Taggar v. Holder*, 736 F.3d 886, 889 (9th Cir. 2013) ("We review the [BIA's] denial of motions to remand for abuse of discretion." (citing *Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 923 (9th Cir. 2007)). Bringas failed to provide additional country conditions evidence or arguments to support the claim that his HIV diagnosis would put him in a more vulnerable position should he be returned to Mexico. Also, the record does not contain evidence of any discrepancy between men and women or between homosexuals and heterosexuals in access to HIV drugs in Mexico. The BIA provided a reasoned explanation for declining to remand that was neither arbitrary nor irrational. *See Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062 (9th Cir. 2008). Therefore, I also disagree with the majority that the agency must consider the evidence of Bringas's HIV diagnosis on remand.

**V.**

Despite my colleagues' faithful recitation of the proper standard of review, they effectively replace it with a much lower standard in violation of Supreme Court precedent and our nation's immigration law. Therefore, I respectfully dissent.